**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

No. 97-60263

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

SHERI LARA SHARPE,

Defendant-Appellant.

No. 97-60704

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

SHERI LARA SHARPE; THOMAS LESLIE HOLCOMB;
PETER HALAT, JR.; AND KIRKSEY MCCORD NIX, JR.
also known as J R, also known as Junior, also known as Kirk,

Defendants-Appellants.

Appeals from the United States District Court
For the Southern District of Mississippi

October 20, 1999

Before POLITZ, JOLLY and DUHÉ, Circuit Judges.

DUHÉ, Circuit Judge:

In this criminal appeal, we examine once again the sordid tale of Kirksey McCord Nix's ("Nix") prison-based criminal empire and the related murders of Vincent and Margaret Sherry. We first examined these events in United States v. Sharpe, 995 F.2d 49 (5th Cir. 1993) ("Sharpe I"). Since Sharpe I new facts have come to light implicating Thomas Leslie Holcomb ("Holcomb") and Peter Halat, Jr. ("Halat") in the Sherrys' murder. As a result of this new information a grand jury issued a fifty-two count indictment against Nix, Holcomb, Halat, and Sheri LaRa Sharpe ("Sharpe"). Following a new trial ("Sharpe II"), Nix and Sharpe were again convicted. Additionally, the jury convicted both Holcomb and Halat for their respective roles in this affair.

## I.   BACKGROUND

### SHARPE I

While serving a life sentence for murder at Angola State Penitentiary, Nix built a criminal empire from which he hoped to earn enough money to buy his way out of prison. Although he dabbled in insurance fraud and drug dealing, Nix's primary money-making scheme was a "lonely hearts" scam designed to defraud homosexual men. Nix and his prison syndicate would place personal advertisements in national homosexual magazines. When men would respond to these ads, Nix or one of his associates would indicate that he was having financial difficulties and needed the respondent to wire money to a Nix associate outside prison. Nix acquired hundreds of thousands of dollars from this scam.

Mike Gillich ("Gillich"), the alleged "underworld boss" of

Biloxi, Mississippi, aided Nix in his various schemes. Peter Halat, a Biloxi attorney, maintained a trust account for Nix. Nix's girlfriend, LaRa Sharpe also assisted in the schemes. She worked out of Halat's office and along with Halat rented a safety deposit box in which they kept cash generated by Nix's operations.

In December 1986, Halat told Nix and Gillich that approximately $100,000 of Nix's money was missing from the office trust account. Halat indicated that he suspected Vincent Sherry, Halat's former law partner and a Mississippi Circuit Judge, of stealing the money. Coincidentally, Judge Sherry's wife Margaret was a Biloxi mayoral candidate critical of Gillich's operations. The prosecution produced evidence that the three men arranged to have the Sherrys killed. In September 1987 Halat discovered the Sherrys dead in their home.

At the first trial for fraud and the attendant murders in 1991, the government argued that Nix, with the assistance of Sharpe, Sharpe's mother, and Gillich, hired ex-convict John Ransom ("Ransom") to kill the Sherrys. Bill Rhodes ("Rhodes"), an associate of Ransom's, testified that Gillich had discussed with him and Rhodes a possible contract murder. Rhodes testified further that he was out of town during the murders and that later Ransom told him that he had murdered the Sherrys. At the first trial, Gillich insisted that Halat had nothing to do with the homosexual scam or the murders. As a result, the government did not prosecute Halat. The jury convicted Nix, Gillich, Sharpe, and Ransom of wire fraud and conspiracy to commit wire fraud. The jury

3

also found Nix and Gillich guilty of travel in aid of murder-for-hire.  We affirmed these convictions in Sharpe I, 995 F.2d 49 (5th Cir. 1993).

## SHARPE II

Nix continued his schemes from jail after the 1991 trial.  The government also continued its investigation into the scam and murders.  This time, the government concentrated its efforts on determining what role Halat, by then the Mayor of Biloxi, played in the crimes.  In 1994 Mike Gillich turned state's evidence in exchange for a reduction of his Sharpe I sentence.  Gillich admitted that Halat was involved in the scams and the murders.  Moreover, Gillich indicated that it was not Ransom who had murdered the Sherrys[1]; but, rather, Thomas Holcomb, a contract killer hired by Gillich.  While the government was procuring Gillich's testimony, it was negotiating with Robert Wright ("Wright") for his testimony concerning a number of drug deals that he had engaged in with Nix and his associates.  In the end, the government granted Wright full immunity for his testimony.

As a result of its further investigations and Gillich's testimony, the government brought a new indictment against Nix, Sharpe, Halat, and Holcomb in 1996.  The indictment charged Nix with racketeering, conspiracy to violate the racketeering statute, fraud, conspiracy to commit wire fraud, money laundering, and conspiracy to obstruct justice.    It charged Sharpe with

---

[1]Gillich insisted that Ransom was involved in the planning of the murders, but did not actually kill the Sherrys.

4

obstruction of justice and conspiracy to obstruct justice for false testimony she gave in the 1991 trial. It charged Halat with obstruction of justice, conspiracy to obstruct justice based on false statements made during the 1991 investigation and trial testimony, conspiracy to violate the racketeering statute, racketeering, and conspiracy to commit wire fraud. Finally, the indictment charged Holcomb with conspiracy to violate the racketeering statute and conspiracy to obstruct justice.

After a lengthy trial, the jury began deliberations on July 11, 1997. During deliberations some of the jurors complained that one of the jurors was making inappropriate sexual remarks and was refusing to participate in the deliberative process. The judge overruled a defense motion for a mistrial and investigated the alleged juror misconduct. Satisfied with his investigation of the matter, the trial judge sent the jurors back for further deliberations. On July 16, 1997 the jury rendered a partial guilty verdict on all of the charges against Nix, Sharpe, and Holcomb and Halat's obstruction of justice and conspiracy to obstruct justice charges. The judge gave the jury an <u>Allen</u> charge and instructed them to continue deliberating on the charges remaining against Halat. On July 17, 1997 the jury found Halat guilty of conspiracy to commit wire fraud and conspiracy to violate the racketeering statute. Each defendant now challenges his or her convictions on multiple grounds.

## II. ISSUES RAISED BY MULTIPLE DEFENDANTS

A. Motion for Mistrial Based on Jury Misconduct

After three days of jury deliberation, the court advised the parties that it had received several complaints concerning conduct of juror number six. When a juror complained to the marshal, the marshal instructed the juror to put his complaints in writing for the court. The complaints alleged that juror number six used lewd and sexually explicit language towards other jurors, made sexually explicit comments about trial participants, behaved rudely, and made his decision based on factors outside of the evidence. The court, in the presence of the lawyers and defendants, questioned each juror individually, asking each to specify any incidents of sexual misconduct, intimidation, or the interjection of extrinsic factors into the deliberative process by juror number six. After the individual inquiries, the judge recalled all the jurors to the courtroom, and urged them to consider the evidence, to deliberate, and to act civilly. Finally, the judge polled the jurors, asking each if they could be impartial, fair, follow the court's instructions, and base their verdict only on the evidence and the law. Each juror responded affirmatively.

The defendants several times objected unsuccessfully to the judge questioning the jurors, recommending instead that the judge respond in writing instructing the jury to follow the court's instructions. The government several times moved unsuccessfully to remove juror number six.

The defendants contend that juror misconduct directly

impacting the deliberative process warranted a mistrial.[2]   We
review a district court's decision to hold a hearing to determine
whether juror misconduct has occurred for abuse of discretion.  See
United States v. Chiantese, 582 F.2d 974, 978 (5th Cir. 1978).  The
district court did not abuse its discretion in investigating
complaints of sexual harassment, intimidation, and reliance on
extrinsic evidence.  In addition, the record does not show that
questioning the jurors in any way impacted the deliberative
process.  On the contrary, Judge Pickering proceeded in a very
careful and conscientious manner.  He prefaced each inquiry by
reminding the jurors that they were the ultimate judges of fact and
that they should not be influenced by anything he said or did.  He
also warned the jurors not to reveal the details of the
deliberative process in their responses.  Finally, he consulted
with the lawyers throughout, giving thoughtful consideration to
their suggestions.

B. Sharpe's and Holcomb's Motion for Severance

The district court denied Sharpe's and Holcomb's motion to
sever.  Sharpe asserts that she suffered specific and compelling
prejudice from being tried jointly with Nix and Holcomb.  Sharpe
contends that: she was the only defendant not indicted on the drug
conspiracy charge which was the primary focus at trial; she was not

_____

[2]The defendants jointly moved for a mistrial prior to the
district court individually questioning the jurors, and Sharpe
again moved for mistrial when, at the end of the district court's
questioning, the district court did not remove any jurors.

7

charged with murder or conspiracy to murder the Sherrys; and evidence with no relevance to charges against Sharpe predominated at trial.

Holcomb contends that the government did not have adequate evidence to convict him as the trigger man, so it used the RICO conspiracy charges and voluminous evidence unrelated to him to hold him guilty by association. Holcomb also contends that his right to a fair trial was similarly prejudiced because he was tried with Nix and Sharpe, both of whom previously had been tried and convicted. He also complains he was denied the use of exculpatory evidence by his co-conspirators, and his motions for a separate trial were denied without a limiting instruction to the jury to consider only the evidence against him.

We review a district court's denial of severance for abuse of discretion. See United States v. Hare, 150 F.3d 419, 426 (5th Cir. 1998). A defendant must show "specific and compelling prejudice against which the district court could not provide adequate protection, and that this prejudice resulted in an unfair trial." See United States v. Mitchell, 31 F.3d 271, 276 (5th Cir. 1994) (citations omitted).

Sharpe's list of witnesses who made no reference to Sharpe and her assertion that charges against her were peripheral to the primary focus of the trial do not amount to specific and compelling proof of prejudice. Furthermore, neither do Holcomb's allegations of prejudice regarding guilt by association, the denial of exculpatory evidence and the lack of limiting instructions to the

8

jury.

C. Government Testimony Violating 18 U.S.C. § 201(c)(2)

All four defendants assert that Gillich's and Wright's testimony should have been suppressed, because the government criminally bribed them to testify as government witnesses. The government agreed to reduce Gillich's twenty-year prison sentence for a prior conviction to time served, to dismiss bribery charges against Gillich and others, and to refrain from indicting Gillich's daughter and son-in-law. The government granted Wright complete immunity. 18 U.S.C. § 201(c)(2) creates criminal penalties for bribing witnesses, and defines bribery as "[d]irectly or indirectly, giv[ing], offer[ing], or promis[ing] anything of value to any person, for or because of the testimony under oath . . . given or to be given . . . as a witness upon a trial . . . ." The defendants note that the government has given Gillich and Wright something of value, namely freedom, because of their testimony against the defendants in this trial.

We review the bribery issue for plain error, since the defendants failed to object at trial. See United States v. Haese, 162 F.3d 359, 366 (1998). This argument is foreclosed by our authority that Section 201(c)(2) does not apply to government plea bargains in exchange for testimony. See id. at 367-68.

III. SHERI LARA SHARPE

A. Motion to Dismiss the Indictment

9

In 1991, the government indicted Sharpe for and a jury convicted her of conspiracy to commit wire fraud and conspiracy to commit murder-for-hire. In 1996, the government indicted Sharpe for and a jury convicted her of seven counts of obstruction of justice[3] and one count of conspiracy to obstruct justice. Sharpe moved to dismiss the indictment, asserting that: (1) Double Jeopardy barred her prosecution; (2) the substantive obstruction of justice charges failed to state a claim under 18 U.S.C. § 1503; and (3) were multiplicious.

1. Double Jeopardy

Sharpe argues that Count I[4] of the 1991 indictment covered both the 1996 substantive obstruction of justice charges and the conspiracy to obstruct justice charge.

A subsequent prosecution avoids the Double Jeopardy bar by

[3]The substantive obstruction counts arise from separate portions of Sharpe's testimony at the 1991 trial. Count 3 involves Sharpe's testimony that she never made a three-way call to any victim of the homosexual scam. Count 4 involves Sharpe's testimony that she did not participate in the homosexual scam after Easter of 1986. Count 5 involves Sharpe's testimony that she never delivered money to Gillich. Count 7 involves Sharpe's testimony that she did not use legal materials in Halat's and Sherry's office to enhance participation in the homosexual scheme. Count 8 involves Sharpe's testimony that she had never possessed a silencer. Count 10 involves Sharpe's testimony that she never discussed the scam with Gillich. Count 11 involves Sharpe's testimony that Halat had no knowledge of the homosexual scam.

[4]Count I charged Sharpe with conspiracy to commit wire fraud and conspiracy to commit murder-for-hire, and stated that "[i]t was . . . part of the conspiracy that the co-defendants, co-conspirators and confederates cover up and conceal the objectives of the conspiracy and their involvement therein." Count I cited Sharpe's receipt of scam money from a Nix confederate in January and February 1986 as an overt act.

satisfying the Blockburger same-elements test.[5]  Blockburger v. United States, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932). See also United States v. Dixon, 509 U.S. 688, 697, 113 S.Ct. 2849, 125 L.Ed.2d 556 (1993).  Under the Blockburger test,  each offense must contain an element not contained in the other; if not, they are the same offense within the Clauses' meaning and double jeopardy bars subsequent punishment or prosecution.  Id. at 688.

The elements of a Section 371 conspiracy are: (1) an agreement between the defendant and one or more other persons to violate a law of the United States; (2) an overt act by one of the conspirators in furtherance of the conspiracy; and (3) the defendant's intent to further an unlawful objective of the conspiracy.  See 18 U.S.C.A. § 371 (West 1984); United States v. Razo-Leora, 961 F.2d 1140, 1144 (5th Cir. 1992).  The relevant "laws of the United States" for the purpose of the 1991 indictment were murder-for-hire[6] and wire fraud.[7]  The elements of obstruction

---

[5]The Supreme Court developed the Blockburger test, a rule of statutory construction triggered when the same conduct violates more than one statutory provision.  See Garrett v. United States, 471 U.S. 773, 778-79, 105 S.Ct. 2407, 85 L.Ed.2d (1985).  The Court noted that "[i]nsofar as the question is one of legislative intent, the Blockburger presumption must of course yield to a plainly expressed contrary view on the part of Congress."  Id. at 779.

[6]The elements of murder to hire are: (1) traveling or causing another to travel in interstate or foreign commerce, or using or causing another to use the mail or other facility of interstate or foreign commerce; (2) with intent that a murder be committed in violation of the laws of any State or the United States; and (3) as consideration for the receipt of pecuniary value. See 18 U.S.C.A. § 1958 (West Supp. 1998).

[7]The elements of wire fraud are: (1) the defendant knowingly participated in a scheme to defraud; (2) use of interstate wire communications to further the scheme; and (3) the defendant

11

of justice are: (1) a judicial proceeding was pending; (2) the defendant knew of the judicial proceeding; and (3) the defendant acted corruptly with the specific intent to influence, obstruct, or impede that proceeding in its due administration of justice. See 18 U.S.C.A. § 1503 (West 1984).

Double Jeopardy does not bar the 1996 substantive obstruction counts, because they survive the Blockburger test. Regarding the Blockburger test, obstruction of justice requires specific intent to obstruct justice and conspiracy does not, while conspiracy requires an agreement between two or more people and obstruction of justice does not.

The 1996 conspiracy to obstruct justice count also survives the Blockburger test. Regarding the Blockburger test, the 1991 conspiracy count required an agreement to further the wire fraud and murder-for-hire schemes, while the 1996 conspiracy count did not; the 1996 conspiracy count required an agreement to further the obstruction of justice scheme, while the 1991 conspiracy count did not.

The parties vigorously disputed in brief and at oral argument whether one or two conspiracies existed for Double Jeopardy purposes. We need not resolve this issue, since even if only one conspiracy existed, "a person's participation in a conspiracy ends when that person is arrested for his role in the conspiracy. . . . '[F]urther [participation in an] old conspiracy after being charged

_____

intended some harm to result from the scheme. See 18 U.S.C.A. § 1343 (West 1984); United States v. Powers, 168 F.3d 741, 746 (5th Cir. 1999).

12

with that crime becomes a new offense for purposes of a Double Jeopardy claim.'" United States v. Dunn, 775 F.2d 604, 607 (5th Cir. 1985) (internal citations and quotes omitted). Sharpe's false testimony occurred during the wire fraud and murder-for-hire trial, *after* she was arrested for conspiracy to commit wire fraud and murder-for-hire. Thus, even assuming one conspiracy, further participating in that conspiracy by falsely testifying constituted a new offense for Double Jeopardy purposes. Although the conversation with her confederate occurred before the 1991 indictment, the government did not prosecute Sharpe for that conversation. See United States v. Felix, 503 U.S. at 387.

2. Failure to State a Claim Under 18 U.S.C. § 1503

Sharpe argues that, as a matter of law, perjury at trial alone does not obstruct the clear administration of justice. Therefore, the indictment failed to state a violation of 18 U.S.C. § 1503 and should be dismissed. We disagree. "[W]e defined the statutory term 'administration of justice' as 'the performance of acts required by law in the discharge of duties such as appearing as a witness and giving truthful testimony when subpoenaed.' . . . The perjurious witness can bring about a miscarriage of justice by imperiling the innocent or delaying the punishment of the guilty." United State v. Griffin, 589 F.2d 200, 203 n.4, 204 (5th Cir. 1979). Sharpe's efforts to distinguish false testimony at trial from the false testimony at a grand jury proceeding in Griffin are not persuasive, since false testimony in either venue may

13

"imperil[] the innocent or delay[] the punishment of the guilty."
Id. at 204.

Alternatively, Sharpe challenges the sufficiency of the evidence of her specific intent to impede the administration of justice. We review a challenge to the sufficiency of the evidence by viewing the evidence in the light most favorable to the verdict. We affirm if a rational trier of fact could have found all essential elements of the crime beyond a reasonable doubt. United States v. Sultan, 115 F.3d 321, 324 (1997). Under Section 1503, an act with the "natural and probable effect" of interfering with the due administration of justice satisfies the intent requirement for obstruction of justice. United States v. Aquilar, 515 U.S. 592, 599, 115 S.Ct. 2357, 132 L.Ed.2d 2357 (1995). This record makes clear that a reasonable jury could have found that Sharpe's false testimony concerning Gillich's, Halat's, and her own involvement in the wire fraud and murder-for-hire scheme had the natural and probable effect of interfering with the due administration of justice.

3. Multiplicious Substantive Obstruction of Justice Charges

Sharpe asserts that the seven false responses cited in the indictment were not separate, distinct acts. They were part of a continuous scheme or transaction, evidenced by the responses all being given during the same trial, on the same day, and, according to the government, all for the purpose of covering up the wire fraud and murder conspiracies. Therefore, they could support only

14

one charge.

Charging a single offense under more than one count of an indictment is multiplicious and raises the Double Jeopardy specter of multiple punishments. See United States v. Soape, 169 F.3d 257, 266 (5th Cir. 1999). But an obstruction of justice indictment is not multiplicious when it contains charges for separate and distinct acts of perjury, even if the acts are all related and arise out of the same transaction or subject matter, if they require different factual proof of falsity. See United States v. Harrelson, 754 F.2d 1182, 1184 (5th Cir. 1985) (noting separate perjury charges for separate false declarations are not multiplicious); United States v. DeLaTorre, 634 F.2d 792, 795 (5th Cir. 1981) (same); United States v. Nixon, 634 F.2d 306, 313 (5th Cir. 1981) (same). However, separate counts based on multiple answers to a rephrased question would be multiplicious. See Id. at 313. In this record each of the substantive obstruction counts cites a separate instance of false testimony, requiring different factual proof of falsity. See fn. 3 supra. Therefore, the obstruction counts are not multiplicious.

IV.   NIX AND HALAT

A. Count 1 - RICO

Count 1 alleges the following:  Nix, Cook, Halat, Holcomb, Sharpe (unindicted), and others known and unknown constituted an enterprise, a group of individuals associated in fact which engaged in various criminal activities affecting interstate and foreign

15

commerce, including 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1503 (obstruction of justice), 18 U.S.C. § 1512 (obstruction of justice), 18 U.S.C. § 1952(a) (interstate travel in aid of racketeering), 18 U.S.C. § 1956(a)(1)(A)(i) (money laundering), 21 U.S.C. § 841(a) (drug trafficking), 21 U.S.C. § 846 (conspiracy to traffic drugs), Miss. Code Ann. § 97-3-19 (1972), and Miss. Code Ann. § 97-1-1 (1972). The purposes of the enterprise included enriching the members and associates of the enterprise and generating funds for procuring Nix's release from prison. These defendants conspired to violate 18 U.S.C. § 1962(c) by conducting and participating, directly and indirectly, in the conduct of the affairs of the enterprise, through a pattern of racketeering activities. The pattern of racketeering activity includes the following acts: the Sherry murder conspiracy and murders; the pre-Sharpe I homosexual scam; the drug conspiracy; obstruction of justice; and the post-Sharpe I homosexual scam.

Nix and Halat moved to dismiss Count 1 as duplicitous, asserting that it alleged multiple conspiracies rather than one RICO conspiracy. An indictment is duplicitous if "it joins in a single count two or more distinct offenses." United States v. Baytank, 934 F.2d 599, 608 (5th Cir. 1991). We review such claims de novo. See United States v. Trammell, 133 F.3d 1343, 1354 (10th Cir. 1998). We assess the indictment to determine whether it can be read to charge only one violation in each count. See United States v. Mastelotto, 717 F.2d 1238, 1244 (9th Cir. 1983). The government can not "combine totally unrelated agreements and overt acts in a

16

single RICO conspiracy." See United States v. Sutherland, 656 F.2d 1181, 1194 (5th Cir. 1981). However, if there is a single "agreement on an overall objective," multiple conspiracies may be tried as a single enterprise conspiracy under RICO. Id. at 1192-93. This indictment alleges enriching the members and associates of the enterprise and generating funds for procuring Nix's release from prison as overall objectives of the conspiracy. It also alleges that conspiring to kill and killing the Sherrys, the pre-Sharpe I homosexual scam, the drug conspiracy, obstruction of justice, and the post-Sharpe I homosexual scam promoted these overall objectives. Therefore, Count One can be read to allege only one violation.

Alternatively, Nix and Halat assert that even if the indictment can be read to allege only one violation, the government proved multiple conspiracies at trial, creating a fatal variance from the one conspiracy alleged in the indictment. "A variance results when the charging terms of the indictment remain unaltered, but the evidence at trial proves facts other than those alleged in the indictment." United States v. Ramirez, 145 F.3d 345, 351 (5th Cir. 1998). A reversal based on variance between the indictment and proof requires two findings: (1) that the trial evidence actually proved multiple conspiracies, and (2) that the variance affected a substantial right of the appellant. See United States v. Franklin, 148 F.3d 451, 459 (5th Cir. 1998). Assuming without deciding that the trial evidence proved multiple conspiracies, neither defendant proved in this record that any such variance

17

affected a substantial right.

B. Count 51

Count 51 alleges the following:  Beginning in 1985 and continuing until October 26, 1996, the date of the indictment, Nix and Halat conspired to devise a scheme to defraud by means of wire (telephone and telegraph) in violation of 18 U.S.C. § 1343.  Nix and his confederates advertised in periodicals soliciting help, fraudulently claiming they needed financial help to relocate, travel, and for other expenses.  Then they called the respondents and had them wire funds, either through Western Union or by wire transfer.  The indictment specifically references 66 wire transfers covering the periods from January 1, 1986 to April 30, 1986 and from September 15, 1988 to September 22, 1988. The funds were delivered to Halat and others, for the use and benefit of Nix and the enterprise.  Halat and others  maintained and disbursed the funds as Nix directed.  Overt acts included homosexual scam activity in 1986 and 1988, money laundering activities,[8] homosexual scam activity in 1986 and 1992, homosexual scam activity in 1985 and 1989.

Nix and Halat unsuccessfully moved to dismiss Count 51 as duplicitous, asserting that the count alleged two separate conspiracies rather than one conspiracy.  We affirm because the evidence clearly shows that wire fraud conspiracy charged in count

---

[8]The district court dismissed the money laundering charges as not supported by any evidence.

18

51 did not end with Nix's conviction; rather, the evidence supports a single, on-going conspiracy.

## V. NIX, HOLCOMB, AND HALAT

Nix, Holcomb, and Halat argue that the statute of limitations expired before return of the indictment on October 22, 1996 on Count 1 RICO conspiracy and/or Count 50 and 51 wire fraud conspiracy. The limitations period for RICO offenses is five years which begins running upon the accomplishment or abandonment of the objectives of the conspiracy. United States v. Coia, 719 F.2d 1120, 1124 (11th Cir. 1983). Nix and Halat argue that the government declared the conspiracy over in Sharpe I in May 1996. Nix contends that the only acts after Sharpe I were concealment, which are not part of the conspiracy. Holcomb suggests that the only acts occurring within the prescription period were the acts of concealment and an allegedly threatening letter written by Cook (another co-conspirator) to Swetman (a witness). However, he contends, none of these acts were done in furtherance of the conspiracy and thus the statute of limitations was not tolled.

We review limitations challenges for the sufficiency of the evidence to support them because the scope of the conspiracy and membership in it are questions of fact for the jury. We review a challenge to the sufficiency of the evidence by viewing the evidence in the light most favorable to the verdict. We affirm if a rational trier of fact could have found all essential elements beyond a reasonable doubt. Sultan, 115 F.3d at 324. However, the plain error standard applies to Nix's and Halat's limitations

claims because they were not raised before trial. United States v. Mulderiq, 120 F.3d 534,540 (5th Cir. 1997).

On this record we find that there was sufficient evidence to find that the defendants were involved in ongoing crimes that tolled the limitations period. The conspiracy was still in existence in 1992 when Nix and another prisoner received money from the new and already existing homosexual scam victims. Holcomb offered to assist Gillich during his Sharpe I difficulties, showing that he was still willing to assist in the larger RICO and obstruction of justice conspiracies. The acts done to conceal the completed crimes were part of the conspiracy and thus tolled the limitations period. Halat's acts of concealment, such as committing perjury, clearly were acts done in furtherance of the main criminal objectives of the conspiracies.

## VI. THOMAS LESLIE HOLCOMB

### A. Evidentiary Errors

We review admission and exclusion of evidence for abuse of discretion. See United States v. Skipper, 74 F.3d 608, 612 (5th Cir. 1996). "[E]ven if we find an abuse of discretion in the admission or exclusion of evidence, we review the error under the harmless error doctrine." Id. Evidentiary rulings must be affirmed unless they affect the complaining party's substantial rights. See id. Holcomb argues that, considered as a whole, the district court's evidentiary errors warrant a new trial. See United States v. Riddle, 103 F.3d 423, 434-35 (5th Cir. 1997)

20

(cumulative effect of evidentiary errors warranted a new trial).

First, Holcomb maintains that the trial court erred by excluding the testimony of Bobby Joe Faubion ("Faubion"). Holcomb argues that Faubion's testimony would have supported his claim that John Ransom committed the murders. The proffered testimony was: (1) Faubion had a phone conversation with Ransom; (2) Ransom told Faubion that Halat and Nix approached him about killing a judge; (3) Ransom did not mention Holcomb's name; and (4) Faubion did not hear Holcomb's name in conversations with Nix and others.

Fed R. Evid. 403 provides that "[r]elevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . or needless presentation of cumulative evidence." Holcomb offers nothing to rebut the district court's finding that the proffered testimony's prejudice to the other defendants substantially outweighed its probative value. Holcomb was able to use other evidence to advance his "other gunman" defense. Accordingly, we conclude that the district court did not abuse its discretion by excluding Faubion's testimony. We thus need not address the court's other reasons for excluding the testimony.

Second, Holcomb contends that the district court erred by refusing to admit letters of recommendation written by the Government on behalf of Bill Rhodes ("Rhodes"). The district court did not refuse to admit the letters but, rather, reserved its ruling on their admissibility. Assuming the letters were admissible, Holcomb invited error by failing to renew his offer of

21

proof at trial.

Third, Holcomb argues the district court erred by refusing to admit exculpatory FBI lab reports relating to hair, fiber, blood, and print analysis done by FBI lab examiners. Arguing that the reports were admissible under Fed. R. Evid. 803(8), the public records exception to the hearsay rule, Holcomb contends that the reports showed that he was not a match with the samples taken from the crime scene.[9] Holcomb's reliance on the public records exception is misplaced. Rule 803(8)(B) excludes "matters observed by police officers and other law enforcement personnel" in criminal cases. Further, the district court permitted Holcomb to publish the contents of the reports to the jury. Thus, Holcomb has not shown that he was prejudiced by the exclusion of the reports themselves.

Fourth, Holcomb argues Brett Robertson's ("Robertson") in-court identification was too suggestive because of a newspaper article and photo Robertson got from his mother. After seeing the newspaper photo, Robertson advised the government that the photo of Holcomb in the newspaper was the same person he saw driving a Ford on September 14, 1987, the night of the Sherry murder. Holcomb argues that a conviction based in part upon an eyewitness' photographic identification may be set aside if the procedure was so impermissibly suggestive as to give rise to a substantial likelihood of irreparable misidentification. <u>United States v.</u>

---

[9]At trial, Holcomb relied on the Fed. R. Evid. 803(6), the business records exception.

22

Fletcher, 121 F.3d 187, 194 (5th Cir. 1997).  However, Fletcher is inapplicable because it involved the issue of a photographic line up prepared by police.  In contrast, Robertson's encounter with Holcomb's photograph was unplanned and unexpected, and thus did not give rise to a due process challenge.  United States v. Seader, 440 F.2d 547, 550 (5th Cir. 1971).  Holcomb also contends that the district court should have permitted him to employ an expert witness to challenge Robertson's testimony.  However, Holcomb has not shown that the court was obligated to grant the defendant assistance of an expert under these circumstances.  United States v. Williams, 998 F.2d 258, 263 (5th Cir. 1993)

Fifth, Holcomb argues that the trial court erred by permitting Baylis, Putnam, Denike, and Osborne to testify about Holcomb's other crimes and bad acts.  See Fed. R. Evid. 404(b).  We review alleged Rule 404(b) violations under the two-pronged test of United States v. Beechum, 582 F.2d 898, 911 (5th Cir. 1978).  To be admissible, (1) the extrinsic evidence must be relevant to an issue other than the defendant's character and (2) the probative value of the evidence may not be substantially outweighed by undue prejudice.  See id.; Fed. R. Evid. 403 (stating that relevant evidence may be excluded if "its probative value is substantially outweighed by the danger of unfair prejudice").  Regarding the second prong, the district court made the requisite Rule 403 determination.  We consider the first prong in greater detail.

Baylis and Putnam were inmates who testified that Holcomb admitted to them that he killed the Sherrys.  The district court

23

allowed Baylis and Putnam to testify that Holcomb also admitted to being arrested in Florida and shooting a "snitch" in Texas. Baylis also testified that he knew Holcomb in the 1970's when Holcomb was allegedly involved in stealing weapons. The district court permitted Officer Denike to confirm the details of Holcomb's Florida arrest. Holcomb argues that allowing Baylis, Putnam, and Officer Denike to testify about crimes and bad acts that were not related to the Sherry murders was error because "[e]vidence of other crimes, wrong, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Id. The problem with Holcomb's argument is that the testimony about his other crimes and bad acts was not offered to prove that Holcomb acted in conformity with his bad character. See id. (stating that "[e]vidence of other crimes, wrongs, or acts . . . may . . . be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."). Instead, the evidence was offered to show that Baylis and Putnam had information that they could only have learned from Holcomb, corroborating their claim that Holcomb confessed to killing the Sherrys. See United States v. McCarty, 36 F.3d 1349, 1353-55 (5th Cir. 1994) (holding that admitting extrinsic evidence to corroborate the defendant's confession to a cellmate was not reversible error). The district court did not abuse its discretion by admitting this evidence.

Similarly, Holcomb contends that Officer Osborne's testimony constituted impermissible extrinsic character evidence. Officer

Osborne, a Texas law enforcement official, testified that he found a .22 caliber pistol and a drawing of a silencer during a search of Holcomb's home in 1988. The pistol was not the same one used in the Sherry murders. The district court did not abuse its discretion by admitting this evidence because it was admitted to show intent, motive, knowledge, opportunity, and method of operation. See Fed. R. Evid 404(b).

Finally, Holcomb asserts that the district court erred by admitting double hearsay. Gillich testified about the conspiracy in which he, Cook, Holcomb, and others participated. He testified that, the day after the murders, Cook called Holcomb to ask about the hit. Gillich testified that Holcomb confirmed murdering the Sherrys. The district court correctly admitted the testimony because both Holcomb's statements to Cook and Cook's statements to Gillich were admissible as statements of co-conspirators made in furtherance of the conspiracy. See Fed. R. Evid. 801(d)(2)(E); see United States v. Gironda, 758 F.2d 1201, 1216-19 (5th Cir. 1985) (concluding that the district did not err by permitting a co-conspirator to testify that another conspirator had told him about a threatening phone call he received from the defendant).

B. Sufficiency of the Evidence to Convict Holcomb

Holcomb contends that the evidence was insufficient to convict him on Count 1 and Count 50 because the government did not prove that he had knowledge of the objectives of the overall conspiracy. He says the government's theory assumes he committed the murders

25

but has nothing to do with the homosexual scams, wire fraud, mail fraud, money laundering, and other activities. We review the evidence in the light most favorable to the verdict. We affirm if a rational trier of fact could have found all essential elements of the crime beyond a reasonable doubt. Sultan, 115 F.3d at 324.

To prove a RICO conspiracy the government must establish (1) that two or more people agreed to commit a substantive RICO offense and (2) that the defendant knew of and agreed to the overall objective of the RICO offense. United States v. Posada-Rios, 158 F.3d 832, 857 (5th Cir. 1998). The evidence was sufficient to convict Holcomb of the RICO conspiracy. First, Holcomb agreed with the objective by killing Vincent Sherry. Second, Holcomb agreed to commit violence and threats of violence to protect the enterprise. To prove obstruction of justice the government must show an intent to endeavor to impede the due administration of justice. United States v. Williams, 874 F.2d 968, 976-82 (5th Cir 1989). Here again the evidence was sufficient to convict Holcomb of this crime. Holcomb threatened Swetman to keep him from cooperating with the government.

VII. HALAT

A. Duplicity

Halat contends that Count 16 of the indictment is duplicitous and that the district court erred in failing to give a unanimity instruction to the jury regarding this Count. Count 16 alleged that Halat violated 18 U.S.C. § 1503 by obstructing justice when he

26

testified falsely in <u>Sharpe I</u>.  The indictment included the following excerpt of the testimony involved:

> Question: At some point in time, did you come to learn whether or not there was a scam, homosexual scam operating out of Angola in which Kirksey Nix was involved?

> Halat: I came to find out that there was activity going on at Angola prison that Kirksey Nix was alleged to be involved in.

> Question: When did that happen?

> Halat: May of 1988

> * * *

> Question: As of that date or as of the time you received the information from the F.B.I., whatever date that was prior to May 13th, 1988, what knowledge did you have of your office being used, as a depositor of scam funds?

> Halat: I don't believe my office was being used as a depository of scam funds.

Halat argues that Count 16 is duplicitous because it alleged two separate and distinct answers to two different questions each of which could support a separate conviction for obstruction of justice.  Halat also contends that the district court erred in failing to instruct the jury that it must unanimously find that Halat lied regarding a particular answer.

Halat moved to dismiss the indictment before trial on the grounds that it was duplicitous, but did not request a unanimity instruction or object when the district court did not give one. "An indictment may be duplicitous if it joins in a single Count two or more distinct offenses." <u>United States v. Baytank (Houston), Inc</u>., 934 F.2d 599, 608 (5th Cir. 1991).  We have previously held

27

that the government may include several acts within a single Count where those actions represent a single, continuing scheme provided:

> the indictment (1) notifies the defendant adequately of the charges against him; (2) does not subject to the defendant to double jeopardy; (3) does not permit prejudicial evidentiary rulings at trial; and (4) does not allow the defendants to be convicted by a nonunanimous verdict.

United States v. Fisher, 106 F.3d 622, 632 (5th Cir. 1997) (internal quotations omitted). However, if an indictment is duplicitous and the defendant is prejudiced, then the conviction may be subject to reversal. See id.

Halat does not argue that he was prejudiced in any way by the inclusion of the two acts in Count 16. Additionally, the circumstances involved in Count 16 satisfy many of the criteria specified above. The government proved and the district court actually instructed the jury that the issue was not whether the particular responses, considered individually and out of context, were made intentionally with knowledge of falsity, but rather, whether Halat's responses were made as part of an endeavor to impede and block the flow of truthful information, in other words, a single continuous scheme. The indictment also adequately notified Halat of the charges against him and does not create a danger of double jeopardy because it specifically includes the statements on which the government relied in prosecuting Halat for obstruction of justice. Regarding the risk of a non-unanimous jury verdict, the district court did not give the jury an unanimity instruction concerning Count 16 specifically, and Halat did not object or request that such an instruction be given; therefore, we

28

review the district court's decision for plain error.  See United States v. Yamin, 868 F.2d 130, 132 (5th Cir. 1989).  Again, Halat does not argue that he was prejudiced by the district court's failure to give a unanimity instruction.  For these reasons, Halat's arguments fail.

B. Ex Post Facto and Sentencing

Halat also argues that his ten year sentence for obstruction of justice violates the Ex Post Facto Clause of the Constitution because at the time he engaged in the prohibited conduct, the sentence for obstruction of justice was only five years, rather than ten.  We need not address this argument because Halat waived his right to appeal his sentence in exchange for the government's agreement not to appeal a sentence imposed below the guideline range.  See United States v. Dees, 125 F.3d 261, 269 (5th Cir. 1997); United States v. Melancon, 972 F.2d 566, 567 (5th Cir. 1992) ("We hold that a defendant may . . . waive his statutory right to appeal his sentence.").  Halat does not contend that his waiver was not informed and voluntary.  See id.

C. Deliberate Ignorance Instruction

Nix and Halat complain that the district court mistakenly instructed the jury that the defendants acted "knowingly" if they "deliberately closed [their] eyes to what otherwise would have been obvious."  First, they contend that there was no evidence to support the instruction.  This Circuit has established a two-part

test to determine when a deliberate ignorance instruction is warranted. "The evidence must show that: (1) the defendant was subjectively aware of a high probability of the existence of the illegal conduct; and (2) the defendant purposely contrived to avoid learning of the illegal conduct." United States v. Faulkner, 17 F.3d 745, 766 (5th Cir. 1994). Halat argues that the government did not show that he knew of the conspiracies, that he was subjectively aware of a high probability of illegal conduct, or that he sought to avoid learning of the illegal conduct. Second, both defendants contend that the court erred in not limiting the deliberate ignorance instruction because the instruction was inconsistent with the essential elements of the conspiracy. They urge us to adopt Second Circuit authority holding that it is an error to give a deliberate ignorance instruction in relation to the issue of knowing participation in a conspiracy. United States v. Fletcher, 928 F.2d 495, 502-503 (2nd Cir. 1991).

The standard of review applied to a defendant's claim that a jury instruction was inappropriate is "whether the court's charge, as a whole, is a correct statement of the law and whether it clearly instructs jurors as to the principles of the law applicable to the factual issues confronting them." United States v. August, 835 F.2d 76, 77 (5th Cir. 1987). The district court "may not instruct the jury on a charge that is not supported by the evidence." United States v. Ortega, 859 F.2d 327, 330 (5th Cir. 1988). Further, in determining whether the evidence reasonably supports the charge, the evidence and all reasonable inferences

30

that may be drawn from it are viewed in the light most favorable to the government.  United States v. Lara-Velasquez, 919 F.2d 946, 950 (5th Cir. 1990).

We find that there was sufficient evidence to support a deliberate ignorance instruction.  Halat knew the high probability of illegal conduct, and he purposely contrived to avoid learning it.  Halat managed the thousands of dollars that Nix's operation generated, and he gave Sharpe, Nix's girlfriend, free run of his office.  Halat also met and spoke with those planning the Sherrys' murders.  Regarding the claim that the instruction was not proper in a conspiracy we note that this Circuit has consistently approved a deliberate ignorance instruction in such cases.  See, e.g., United States v. Scott, 159 F.3d. 916, 924 n.6 (5th Cir. 1998) (citing six different conspiracy cases in which the court has used a deliberate ignorance instruction and noting that the court has consistently held the deliberate ignorance instruction proper when supported by sufficient evidence).

D. Presentation of False Testimony

Halat and Nix contend that the government knowingly presented perjured testimony.  Specifically, at the 1996 trial, witness Rhodes repeated his Sharpe I testimony that he was contacted by Ransom to kill the Sherrys and that Ransom told him he had carried out the contract killing.  Gillich, on the other hand, testified that he contracted with Holcomb to kill the Sherrys, and that he did not know Rhodes or Ransom.

31

They also contend that the government violated their due process rights by changing its theory of the crime after the 1991 trial.  In <u>Sharpe I</u>, the government maintained that Rhodes' testimony alone was sufficient direct evidence of the involvement of Ransom, Gillich and Halat in the murders.  This theory is inconsistent with the government's present reliance on Gillich's testimony that Holcomb, and not Ransom, was the trigger man.  Nix and Halat argue that this "flip-flopping" of theories violates the bedrock principles of due process.

As to the government knowingly presenting false testimony, reversal is required if it is shown that: (1) the testimony was false; (2) the testimony was material to the verdict; and (3) the prosecutor knew or believed the testimony to be false.  <u>United States v. Blackburn</u>, 9 F.3d 353, 357 (5th Cir. 1993).  They contend that, because the testimony of Ransom and Gillich was false, material and the government knew it, their due process rights were violated.  As to the change in government theories, the defendants contend that due process rights are violated when a prosecutor presents two different and inconsistent theories of the same crime in two different trials.  <u>Thompson v. Calderon</u>, 120 F.3d 1045, 1058 (9th Cir. 1997) (en banc), <u>rev'd</u> on other grounds, 523 U.S. 538, 118 S.Ct. 1489, 140 L.Ed.2d 728 (1998);  <u>Drake v. Kemp</u>, 762 F.2d 1449, 1479 (11th Cir. 1985).

Review of an allegation of the use of false evidence requires "an independent analysis to determine whether the facts found by the trial court rise to the level of the applicable legal

32

standard." <u>United States v. O'Keefe</u>, 128 F.3d 885, 893 (5th Cir. 1998). We find the defendants' due process claims to be without merit. First the defendants were well aware of the contradictory testimony during the trial. <u>United States v. Blackburn</u>, 9 F.3d 893, 894 (5th Cir. 1993) (noting that courts have been reluctant to find a deprivation of due process when the prosecution has provided the defense with the necessary information and it can utilize the information). Furthermore, the trial court on several occasions instructed the jurors that it was their job to weigh the credibility of witnesses, and that they could accept or reject witness's testimony.

Regarding the defendants' contention that the government changed its theory, we view the government's presentation of the evidence not as a due process violation but merely as the presentation of new and significant evidence that justified the prosecution in question. The very case the defendants cite recognizes that there is no due process violation when "new significant evidence comes to light that justifies a subsequent prosecution. <u>Thompson</u>, 120 F.3d at 1058.

E. Whether Nix was properly sentenced to life imprisonment

Nix contends that he was sentenced to life imprisonment based on the district court's finding of facts concerning the Counts 1 and 2 Racketeering Acts. Nix argues that the jury did not make specific unanimous findings regarding underlying racketeering activities in convicting him, and that the district court usurped

33

the role of the jury in making these specific findings.  Thus, his right to be found guilty beyond a reasonable doubt by a jury for the underlying activities was negated.  He requests that the court remand for consideration of his sentence based on the base level offense for racketeering, which is United States Sentencing Guideline ("U.S.S.G.") 2E1.1(a)(2).

This Court reviews a district court's application of the Sentencing Guidelines de novo and the district court's factual findings for clear error.  United States v. Dixon, 132 F.3d 192, 201 (5th Cir. 1997).  We find that the district court properly sentenced Nix.  Nix was found guilty of RICO conspiracy Counts 1 and 2 in violation of 18 U.S.C. § 1962.  Both RICO Counts included Racketeering Acts A (conspiracy to commit murder and murder) and B (murder) in violation of the laws of Mississippi.  The applicable sentencing guideline, U.S.S.G. 2D1.1 provides that the base level is the greater of 19 or the "offense level applicable to the underlying racketeering activity."  Here, the underlying activity involved violations of Mississippi murder statutes, and the district court properly analogized this offense to the federal first degree murder offense during sentencing.

CONCLUSION

For the foregoing reasons, we affirm the convictions and sentences of all appellants.

AFFIRMED.

34