**United States Court of Appeals**
**Fifth Circuit**

**F I L E D**

**June 14, 2007**

**Charles R. Fulbruge III**
**Clerk**

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT
_____

No. 06-30124
_____

UNITED STATES OF AMERICA,

                                        Plaintiff - Appellee,

                        versus

LOVELLE LANG; JAYSON LEE,

                                        Defendants - Appellants.
_____

Appeals from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:04-CR-11-2
_____

Before JONES, Chief Judge, and JOLLY and STEWART, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:[1]

    In this appeal, Lovelle Lang and Jayson Lee contest their convictions for conspiracy to commit carjacking and firearms offenses and for substantive offenses of carjacking and firearm crimes.  We affirm their convictions in all respects.

I.

    These defendants and others went on a crime spree in the New Orleans area in the fall of 2003.  As far as the record reflects, the rampage began on October 30, 2003, when Lang and an accomplice[2]

_____

[1] Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

[2] The evidence indicated that the accomplice was not Jayson Lee.

came upon Thumala Mansour and her mother, Nihaya Mansour, in the 4200 block of Cleveland Avenue in New Orleans. At gunpoint, Lang and the accomplice demanded money, stole the Mansours' purses and took Thumala's 2000 Pontiac Grand Am. When the car was later discovered abandoned not far from the site of the carjacking, police found a Nextel two-way radio in the car. They later determined that the radio had been issued to Lang by his employer, TCI Trucking Company.

The next incident happened just after midnight on November 11, when Lee and several others[3] invaded a house at 526 Chapelle Street in New Orleans. Joshua Katz, his fiancée Kay Mary, and her 13-year-old son Madison lived at that address. They were accosted as they got home from a movie. Kay and Madison were able to get inside the house and lock the door, but Lee and his accomplices grabbed Katz and held him at gunpoint. The criminals demanded that Kay open the door or they would shoot Katz. She complied and the jury found that Lee and an accomplice entered the home, ransacked it in search of valuables and eventually departed with a Sony PlayStation and the victims' Lincoln Continental. The car was later abandoned on the front lawn.

Approximately an hour later, at about 1:30 a.m., airline pilot West Warren arrived at home at 323 East William David Parkway in Metairie, Louisiana, in his 1999 Honda Accord. At gunpoint, Lee

---

[3] Lang was acquitted of involvement in this crime.

demanded Warren's keys and asked who was inside his house. After being told that Warren's wife and children were asleep there, Lee forced Warren to open the door. He and another accomplice[4] entered the house, took Warren's wife's purse and eventually left in the Accord.

Some 20 hours later, between 10:00 and 11:00 p.m. on the night of November 11, Lucius Thompson was carjacked at gunpoint in the Lakeside neighborhood of New Orleans. Two gunmen he identified at trial as Lang and Lee forced him into the backseat of his car, a 1996 Nissan Maxima. They eventually picked up two more accomplices and at some point the carjackers forced Thompson to get into the trunk.

The carjackers continued driving and, at approximately 11:30 p.m., accosted Christy Ruffin and Emile Jones, who were parked in a Mercury Mountaineer. After being forced to remove his pants, Jones fled from the carjackers and was successful in getting a Ford Mustang driven by Brandi Clavo to stop at a nearby intersection. To Clavo's surprise, Jones opened the back door, jumped into the car and asked Clavo to take him to get help. Meanwhile the carjackers in Thompson's Maxima pursued Jones and rammed the recently-stolen Maxima into Clavo's Mustang. A man identified by Clavo as Lee jumped out of the Maxima and began firing a semi-automatic pistol at Clavo, striking the car several times. Clavo

---

[4] Lang was also acquitted of involvement in this crime.

3

was lightly injured by glass and was grazed by one bullet. Notwithstanding their fear and the damaged state of the vehicle, Clavo and her passengers were soon able to escape to a nearby police station.

A short time later the Maxima was driven to the vicinity of a house located at 3666 Metropolitan Street in New Orleans East. Thompson remained stuck in the trunk. Lucille Dace, driving her car in this area en route to visit her niece Keva Page, was blocked at the corner of Metropolitan and Elder Streets by the Maxima. Dace testified that she believed that those in the Maxima were attempting to carjack her, but she managed to escape, and telephoned her sister, Page's mother, from her cell phone. Page's mother called to warn Page, who then called the police.

Police officers responded very quickly and drove through the area but apparently stopped at an incorrect house. Page, who lived directly across the street from 3666 Metropolitan Street, testified that she was outside when the police came through and that she saw someone sitting on the porch of the house at that address. Believing the person to be a juvenile neighbor she knew as Travis, she said hello as she walked back to her house across the street.[5] Page then saw the Maxima pull up in front of the house at 3666 Metropolitan. She testified that Lee was the only one in the car

_____

[5] They had a brief conversation during which Page established that the man was not Travis. Page later identified the man on the porch as Lang.

4

as it arrived.  He got out and was joined on the porch by four other young black men, all of whom subsequently entered the house.

The New Orleans police returned soon thereafter.  They first noticed that someone inside the Maxima's trunk was trying to reach into the backseat in an attempt to free himself.  Officers Desmond Julian and Devin Joseph helped Lucius Thompson from the car.  Having received an update from their dispatcher that the perpetrators of the attempted Dace carjacking had entered 3666 Metropolitan, Officers Julian and Joseph then approached the house at that address.

Officer Julian testified that an older man and woman were outside and he asked them who was inside the house.  The woman stated that her 16-year-old son was inside.  She called to him to come out, which he did, and Officer Joseph took custody of the juvenile and patted him down for weapons.  At that time, Officer Julian heard a noise from the side of the house and went to a side door.  He spotted another juvenile male at that door, called to him to come outside, and then passed him to Officer Joseph's custody.  Officer Julian testified that from his vantage point at the side door he then saw another black male apparently asleep on a sofa.  Calling to the man from the doorway, Officer Julian began to enter.  The man on the sofa did not move or respond.  As Officer Julian crossed the threshold, a red laser sight was pointed at his eyes by a second man, crouched down to his right near the doorway.  Officer Julian testified that the suspect said that he was going to kill

5

him.  Julian stated that the suspect, whom he identified at trial as Lang, tussled with him for the gun with the red laser sight.  At this point the man on the sofa got up and shot Officer Julian, who let go of Lang and attempted a tactical retreat through the side door.  Lang headed for the back of the house, stopping to fire at and hit Officer Julian in the leg.  Officer Julian fired his weapon several times, striking and killing the man on the sofa, later identified as Oscar Martin.

Officer Joseph was able to help his wounded partner to the street.  Other officers arrived as backup and they eventually found Lee hiding under a bed in the house and took him into custody. Lang had escaped via the back door.

On November 17, at about 8:00 in the evening, Lang carjacked Jose Hursz's Dodge Ram truck at gunpoint at a service station on Chef Menteur Highway in New Orleans East.  Hursz testified that the gun had a red laser sight which was shining in his left eye when he was first approached.  Hursz instinctively attempted to turn his head to see his attacker but at that moment was shot in the face. He did testify that in the brief time he was able to perceive his assailant's face, he could discern that the gunman was a black male with braided hair and narrow-shaped eyes.  Lang fled in Hursz's Ram.  He was captured in the truck after a high-speed chase in Baton Rouge, Louisiana, on December 2.  The police found in his possession the same 9-mm. handgun with red laser sight which had

been used to shoot Officer Julian and Brandi Clavo's Mustang on November 11.

                                    II.

On April 29, 2004, a grand jury in New Orleans returned a superseding indictment against Lee and Lang. The first two counts respectively charged both men with entering into a wide-ranging conspiracy to commit carjacking crimes and to use firearms during crimes of violence. Lang was also charged with six particular counts of carjacking, six associated counts of using a firearm during a crime of violence and one count of being a felon in possession of a firearm. Lee was charged with three particular carjacking counts, three associated counts of using a firearm during a crime of violence and one count of being a felon in possession of a firearm. One additional count against Lang was dismissed as duplicative before trial.

The defendants' joint trial began on March 7, 2005 and lasted six days. In a verdict returned on March 14, the jury acquitted Lang on counts 3-4 and 7-10. It found him guilty of counts 1-2 ("the conspiracy counts"), counts 5-6 ("the Mansour carjacking"), counts 11-12 ("the Thompson carjacking"), counts 13-14 ("the Hursz carjacking") and count 15 (firearm possession by a felon). Lee, meanwhile, was convicted on all counts naming him, which included the conspiracy counts, counts 7-8 ("the Katz/Mary carjacking"), counts 9-10 ("the Warren carjacking"), the Thompson carjacking and count 16 (firearm possession by a felon).

                                    7

At a sentencing hearing on January 25, 2006, Lang was sentenced to a term of 848 months, over 70 years. Lee was sentenced on February 8 to 835 months in prison. Each defendant timely appealed to this court.

## III.

Lang does not contest his convictions and sentences on the conspiracy counts, the Mansour carjacking and the firearm possession count and instead challenges those for the Thompson carjacking and the Hursz carjacking. We address his two points of error in turn.

## A.

Lang argues that his convictions for crimes associated with the Thompson carjacking are infirm because the trial court allowed Thompson to make an in-court identification of Lang as one of his assailants. Lang argues that because Thompson was apparently unable to identify him for 16 months between the commission of the crimes and his appearance as a trial witness, his in-court identification was unduly suggestive because Lang was present at the defense table and thus it was obvious to Thompson whom he should identify. He goes on to contend that this unduly suggestive identification should not have been admitted because under the particular facts of this case, there was a substantial risk of misidentification.

## 1.

8

The parties first dispute what standard of review applies to this issue. Lang argues that we should apply our normal standard on evidentiary rulings and review for abuse of discretion. United States v. Rogers, 126 F.3d 655, 657 (5th Cir. 1997). The government contends that because Lang did not object to Thompson's testimony at trial, we should review only for plain error. Lang appears to argue both that Lee's counsel contemporaneously objected to Thompson's testimony and that he himself had previously challenged several in-court identifications. In the alternative, Lang argues that even if he did not object, it should not matter because an objection would have been futile since the district court had already overruled Lang's objections to various pre-trial identifications and to previous eyewitnesses' identifications of the defendants during trial testimony.

From our review of the record, we are persuaded that when Thompson was asked at trial if he could point out his attackers to the jury, neither Lang nor Lee objected to the admissibility of his identifications.[6] It appears from the prosecutor's use of singular

---

[6] At a bench conference called at that moment, Lee's counsel first objected on the ground that he had not been previously aware that Thompson was able to identify anyone. Lang's counsel said nothing. The relevant exchange was as follows:

PROSECUTOR: Did [the police] ask you to identify anybody [outside 3666 Metropolitan Avenue]?
THOMPSON: Yes.
PROSECUTOR: Were you able to identify anybody?
THOMPSON: Yes.
PROSECUTOR: And do you see that person in the courtroom today?
THOMPSON: Yes.

nouns and pronouns that the government may have been referring only to Lee when it asked the objected-to question. Lang's counsel may also have assumed as much. Yet, when Thompson finally answered the question, he specifically identified both Lee and Lang. There is no reason why Lang's counsel could not have objected when Thompson identified Lang and stated whatever reasons he had for such an objection. In addition, it is apparent that there would have been nothing futile about objecting at that time. Although the district

---

PROSECUTOR: Could you point him out?
LEE'S COUNSEL: Object, Your Honor. May we approach?
THE COURT: Yes.
(Conference at the bench.)
LEE'S COUNSEL: Your Honor, I wanted you to be aware of the information I had that he couldn't identify anyone.
PROSECUTOR: He may identify him right now.
LEE'S COUNSEL: He said he wasn't able to identify someone.
PROSECUTOR: I will rephrase the question.
THE COURT: I didn't find the question itself objectionable.
LEE'S COUNSEL: I was concerned if he identified someone and I didn't have it, but he didn't. Well I just want to make sure.
THE COURT: Okay.
(Open court.)
THE COURT: Go ahead with the question.
PROSECUTOR: Mr. Thompson, do you see any of the people that carjacked you that night in the courtroom today?
THOMPSON: Yes.
PROSECUTOR: Could you point him out, please, and describe what he's wearing?
THOMPSON: The one with the white shirt on right here and the one with the white shirt over there.
PROSECUTOR: You say, "white shirt?"
THOMPSON: Right there.
PROSECUTOR: Do they have ties on?
THOMPSON: Pardon me?
PROSECUTOR: Do they have ties or no ties?
THOMPSON: No ties.
PROSECUTOR: Your honor, may the record reflect he's identified Mr. Lee and Mr. Lang.
THE COURT: He has.

court had allowed other witnesses to identify the defendants over other objections, Thompson was not mentioned in Lang's pre-trial suppression motion. Furthermore, there was absolutely no "intimation by the judge that no objection would be heard," as required by our case law to establish a futile objection.[7] Taita Chemical Co., Ltd. v. Westlake Styrene, LP, 351 F.3d 663, 668 (5th Cir. 2003). Thus we agree with the government that our review in this case is for plain error.

Our review for plain error proceeds in four steps. United States v. Avants, 278 F.3d 510, 521 (5th Cir. 2002) (citing United States v. Olano, 507 U.S. 725, 730-36 (1993)).

> First, we determine whether the district court's conclusion was erroneous. Second, if the court erred, we determine if the error was clear and obvious under the law as it exists at the time of the appeal. Third, we determine if the error affects substantial rights. Finally, if all of these conditions are satisfied, we have discretion to reverse the trial court's judgment on a forfeited error if we conclude that the error seriously affects the fairness, integrity or public reputation of judicial proceedings.

Id. (citations and quotation marks omitted). We thus proceed now to consider whether it was error for the district court to allow Thompson to identify Lang.

2.

---

[7] On the contrary, the district court consistently and politely allowed the defendants' counsel to re-urge objections to prior rulings for the record.

An argument that identification evidence is allegedly suspect and should have been suppressed requires us to answer two questions: whether the identification procedure was impermissibly suggestive and, if so, "whether the procedure posed a 'very substantial likelihood of irreparable misidentification.'" Rogers, 126 F.3d at 658 (quoting United States v. Sanchez, 988 F.2d 1384, 1389 (5th Cir. 1993)). If we determine that such a likelihood existed, the admission of identification evidence constitutes error. Id.

Under our precedent, "it is obviously suggestive to ask a witness to identify a perpetrator in the courtroom when it is clear who is the defendant." Rogers, 126 F.3d at 658. The test for whether an identification posed a very substantial likelihood of misidentification is governed by the Supreme Court's decision in Neil v. Biggers, 409 U.S. 188, 199 (1972). There the Court outlined five factors for our consideration: (1) the opportunity of the witness to observe the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description; (4) the witness's level of certainty; and (5) the time between the crime and the identification. Rogers, 126 F.3d at 658.

Lang argues that four of these factors support his view that Thompson's identification should have been suppressed. On the first, he contends that Thompson had a severely limited opportunity to observe the person he identified as Lang because it was dark, he

12

was accosted by two men at gunpoint (and the guns naturally drew his attention), he was told to keep his head down while in the back seat of the car and he spent the bulk of the time with the perpetrators locked in the Maxima's trunk.  It is true that it was night and Thompson did not have more than a few seconds to look at the gunmen's faces.  Still, this factor does not weigh in Lang's favor because a few seconds would be ample for Thompson to form a mental image of Lang.

On the second factor, Lang argues that Thompson's attention was diverted.  Lang points out that Thompson was frightened for his life and that he had to get out of the driver's seat and into the back.  As in Rogers, we agree that while "entirely reasonable under the circumstances," profound fear may make a misidentification more likely.  126 F.3d at 659.  Again, however, there is nothing inconsistent between these facts and Thompson having trained his attention on, and formed a mental image of, Lang during the first few seconds of their encounter.

With regard to the third Biggers factor, consistency, Lang points to inconsistencies in Thompson's trial testimony because there is nothing in the record concerning Thompson's pre-trial descriptions of Lang.[8]  Although he gave police some description of

---

[8] Even if we did agree with Lang that Thompson was not entirely consistent on the witness stand in his descriptions of Lang's hair, skin color and height, the evaluation of this type of inconsistency is the province of the jury and is not relevant to the prior consistency factor discussed in Biggers.

13

the carjackers, Thompson apparently said he probably could not identify them and thus was never asked to review a photographic lineup. (He was present at a show-up identification of Lee at 3666 Metropolitan Street but did not tell police that he was certain that this was one of his assailants). This factor is therefore inapplicable in this case. See Rogers, 126 F.3d at 659.

On the fourth Biggers factor, Lang concedes Thompson's certainty and instead argues that certainty is not particularly revealing, citing our conclusion in Rogers that certainty did not outweigh the other factors since "[e]ven the best intentioned among us cannot be sure that our recollection is not influenced by the fact that we are looking at a person we know the Government has charged with a crime." 126 F.3d at 659. Whatever this factor is worth, it is apparent that Thompson was certain of Lang's identity during his trial testimony.

Lang contends that the fifth factor also indicates that the identification was unreliable since there were 16 months between the carjacking and Thompson's appearance at trial. This length of time does not mean the identification is per se unreliable, but it does raise a significant concern. See Rogers, 126 F.3d at 659 (10 months between the crime and the trial identification).

With the exception of the time between the crime and Thompson's identification of Lang, none of these factors weigh clearly in Lang's favor. Three have no weight or are in equipoise and another (certainty) is conceded. Considering these factors and

14

our precedent, although it is apparent that Thompson's identification may have been impermissibly suggestive, it did not pose a <u>very substantial</u> risk of misidentification.

Furthermore, Lang was able to cross-examine Thompson in some detail about his in-court identification, which gave the jury ample opportunity to evaluate his credibility and thus weigh whether the identity of Lang as one of the carjackers was proved beyond a reasonable doubt. That the jury acquitted him of other crimes indicates that it was fully capable of applying this standard. In sum, given our deference to the jury's verdict and the requirement that we view facts in the light most favorable to that verdict, <u>United States v. Hicks</u>, 389 F.3d 514, 533 (5th Cir. 2004), we do not see any reason to find an error in this in-court identification.

Without needing to consider the remainder of the plain error analysis, we thus conclude that there was no plain error in the district court's admission of this identification evidence and affirm Lang's convictions for the Thompson carjacking.

B.

Lang's challenge to his convictions for the Hursz carjacking is that the evidence was insufficient to support a conviction on those counts. More specifically, he argues that his possession of Hursz's car and a gun with a red laser sight are not enough to sustain the convictions because he might have obtained them from a

15

third party sometime after the assault on Hursz. He also claims that he was not adequately identified by Hursz.

Challenges to the sufficiency of the evidence require us to ask "whether, after viewing the evidence in the light most favorable to the prosecution, <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>United States v. Guidry</u>, 456 F.3d 493, 506 (5th Cir. 2006) (quoting <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979) (emphasis in original)).

Lang's argument, at bottom, is that he was not conclusively identified by Hursz and that the remaining circumstantial evidence (his capture in possession of the stolen car and matched gun) is insufficient to convict beyond a reasonable doubt. The government responds that despite the fact the identification is not perfect,[9] it was very much consistent with Lang and there was ample circumstantial evidence to support the verdict beyond a reasonable doubt. <u>See</u> <u>United States v. Ferguson</u>, 211 F.3d 878, 884 (5th Cir. 2000).

After a thorough review of all the evidence and testimony and keeping in mind our duty to view the evidence in favor of the verdict, we agree with the government that Hursz's partial identification, coupled with the facts that Lang was captured

_____

[9] Hursz testified that in a quick glance he was able to perceive that his assailant was a black male with braids and narrow shaped eyes. He also knew that the assailant was tall enough to reach through the high window of his Dodge truck.

16

driving Hursz's truck and in possession of a gun with a laser sight that matched Hursz's description and which Lang used to shoot Officer Julian, is more than enough to sustain the verdict. Lang's convictions on counts 13 and 14 are therefore affirmed.

IV.

Jayson Lee was found guilty on all counts that related to him, namely the conspiracy counts, the Katz/Mary, Warren and Thompson carjackings and possession of a firearm by a felon. He challenges all convictions based on the following arguments: (1) that the conspiracy counts were duplicitous and thus Lee was entitled to a pre-trial severance; (2) that there was a fatal variance between the indictment and the evidence introduced at trial on the conspiracy counts; (3) that the district court erroneously admitted evidence of suggestive identifications; and (4) that the district court erred in not granting Lee a mistrial based on allegedly-inflammatory comments by the prosecutor during closing argument.[10] We consider these arguments in turn.

A.

---

[10] We reject Lee's argument that his due process rights were somehow violated because his probation officer spoke to the Assistant U.S. Attorneys and later testified at trial, because he does not cite any authority that would prohibit the probation officer from doing either. From our review of the record, moreover, it is apparent that Lee was not denied an impartial tribunal on this or any other basis.

We also reject Lee's contention that the cumulative weight of all of the errors he asserts requires reversal of his convictions because, as explained below, we do not find any prejudicial errors.

17

Lee first argues that the conspiracy counts are duplicitous because they lump together three separate conspiracies into one conspiracy:  one to commit crimes prior to November 11, 2003; another for those committed on that date; and a third for those committed thereafter, when Lee was incarcerated.  This argument is supported, Lee says, by the fact that the only overt acts and charges brought against him were committed on November 11.  Thus, Lee contends, his trial was improperly joined to that of Lang and he should have been granted a severance and tried independently.

Duplicity within an allegation in an indictment is a matter of law that we review de novo, United States v. Caldwell, 302 F.3d 399, 407 (5th Cir. 2002), as long as it was raised prior to trial. Lee did raise duplicity in a pre-trial motion.

An indictment is duplicitous if it joins in a single count two or more distinct offenses. United States v. Sharpe, 193 F.3d 852, 870 (5th Cir. 1999).  Several acts may be included within the same charge as long as those acts comprise a single scheme and the indictment "(1) notifies the defendant adequately of the charges against him; (2) does not subject the defendant to double jeopardy; (3) does not permit prejudicial evidentiary rulings at trial; and (4) does not allow the defendant to be convicted by a non-unanimous verdict."  Id.  "The allegation in a single count of a conspiracy to commit multiple crimes is not duplicitous, for the conspiracy is the crime, and that is one, however diverse its objects."  United

18

States v. Cooper, 966 F.2d 936, 939 (5th Cir. 1992) (citation and quotation marks omitted).

Again, Lee is challenging the way the government organized the conspiracy counts because he contends that he was only allegedly involved in crimes committed on November 11.  The government argues that the jury's verdict indicates that it found a single scheme running from October through December 2003.  It also reminds that the district court carefully instructed the jury that "proof of several conspiracies is not proof of the single, overall conspiracy charged in the superseding indictment."

We begin by noting that Lee's division of the crimes and overt acts by their calendar dates is rather misleading.  Lee was alleged to be involved in (and found guilty of) crimes committed in the early hours of November 11 (the Katz/Mary and Warren carjackings) and crimes perpetrated nearly a full 24 hours later (the Thompson carjacking).  More precisely, the indictment charges five separate outbursts of violent activity and Lee was alleged to have been involved in two of those.  What is more, it is apparent that there were different co-conspirators involved in the two episodes Lee attempts to group on November 11:  the group present for the Katz/Mary and Warren carjackings included government witness Royal McField, who was not present for the Thompson carjacking.[11]

---

[11]  The jury also found that Lang was not guilty of the Katz/Mary and Warren carjackings.

19

More crucial to this appeal, the conspiracy charges here meet the test laid out in Sharpe. See 193 F.3d at 870. First, the indictment listed in great detail the overt acts that made up the conspiracy charges. Second, the two offenses in the conspiracy charges do not subject Lee to double jeopardy because at least one distinct element is necessary to prove each crime. See United States v. Delgado, 256 F.3d 264, 272 (5th Cir. 2001). Third, there were no prejudicial evidentiary rulings because the government had every right to attempt to prove a single conspiracy and had to put on evidence about his co-conspirators' acts to do so. Finally, the district court instructed the jury on the importance of unanimity, which itself would cure any error even if the charges were duplicitous. See United States v. Correa-Ventura, 6 F.3d 1070, 1081-82 (5th Cir. 1993).

We are thus persuaded that the conspiracy counts were not duplicitous. Because Lee's arguments for improper joinder and severance rest on this rejected foundation, we reject them as well.

B.

Lee's next argument is closely related to the one just discussed. He contends that there was a fatal variance between the conspiracy charges in the indictment and what the evidence showed at trial. He bases this argument on his assertion that he was only involved in acts that were committed on one calendar day in the life-span of the conspiracy.

20

A variance (also called a constructive amendment of the indictment) occurs "when the jury is permitted to convict the defendant upon a factual basis that effectively modifies an essential element of the crime charged." United States v. Robles-Vertiz, 155 F.3d 725, 728 (5th Cir. 1998) (citation omitted). We only find a variance fatal and reverse the district court where "the trial evidence actually proved multiple conspiracies and ... the variance affected a substantial right of the appellant." Sharpe, 193 F.3d at 866. This demanding standard is all the more stringent in this case because Lee did not renew his motion for a judgment of acquittal under FED. R. CRIM. P. 29 at the close of his own case. Thus we review only for plain error. See United States v. Burton, 324 F.3d 768, 770 (5th Cir. 2003). Furthermore, we will uphold a challenge to the sufficiency of the evidence unless "the evidence and all reasonable inferences, examined in a light most favorable to the government, would preclude reasonable jurors from finding a single conspiracy beyond a reasonable doubt." United States v. Morrow, 177 F.3d 272, 291 (5th Cir. 1999).

We have noted Lee's involvement in two separate episodes of carjacking and violence with different participants, which is sufficient to establish that he was involved in the larger conspiracy and not merely present for one isolated incident. Even if we were more sympathetic to his argument, moreover, "we have long held that when the indictment alleges the conspiracy count as a single conspiracy, but the government proves multiple

21

conspiracies and defendant's involvement in at least one of them, then clearly there is no variance affecting that defendant's substantial rights." United States v. Faulkner, 17 F.3d 745, 762 (5th Cir. 1994) (citations and quotation marks omitted). In sum, from our review of all of the evidence introduced at trial, it is apparent that Lee has not suffered from any error, much less one that affected his substantial rights. We therefore reject his fatal variance argument.

## C.

Lee's next argument is that impermissibly suggestive identification evidence was admitted in violation of his due process rights. He bases this argument not on the in-court identification by Lucius Thompson and instead he challenges: (1) lineup procedures that used a photo of him that had been prominently displayed in the local media and which presented him as the only suspect with a tattoo on his face[12] and (2) the "show-up" identifications various witnesses made of Lee immediately after he was arrested at 3666 Metropolitan Street.

As we have noted, whether an identification violates due process presents two questions: whether the identification procedure was impermissibly suggestive and, if so, "whether the procedure posed a very substantial likelihood of irreparable misidentification." Rogers, 126 F.3d at 658 (citation and

---

[12] Lee's tattoo is on his cheek.

22

quotation marks omitted).  Lee timely objected to the admission of all of the admitted identification evidence and thus we review the district court's decision using an abuse of discretion standard. Rogers, 126 F.3d at 657.

Lee's first argument is that the victims of the Katz/Mary carjacking saw his photo in the local media before seeing the same photo in a police lineup and that that lineup photo was the only one of six that featured a man with a tattoo on his face.  He contends that these facts make their identifications of him in the lineup and at trial unduly suggestive.  He argues that a substantial likelihood of misidentification arises from the fact that government witness McField testified that it was a now-deceased co-conspirator, Stephone Washington (who had a tattoo on his forehead between his eyes), and not Lee who actually perpetrated the Katz/Mary carjacking and home invasion.

Our precedent on this issue is firmly on the side of the government.  In Sharpe, we upheld an identification where the witness was shown a newspaper photo of a suspect by his mother. 193 F.3d at 868.  The photo prompted the witness to call police and report that the photo depicted the suspect he had seen on the night the crime was committed.  Id.  We held that because the witness's encounter with the defendant's photo was "unplanned and unexpected," it was not impermissibly suggestive.  Id.

Here the facts are almost a perfect fit.  Joshua Katz saw Jayson's Lee photo on television and suggested to Kay and Madison

23

Mary that they have a look as well. They then contacted police to report that this was their assailant. Everything about these victims' encounter with Lee's photo in the media was "unplanned and unexpected" and it is therefore not impermissibly suggestive.[13]

Lee's argument that the fact that the police lineup from which numerous witnesses selected Lee contained no other photographs of a man with a tattoo on his face makes it impermissibly suggestive is similarly unavailing. The government is not required to fill a lineup with other photos of men of roughly Lee's age, hair, and skin tone, all of whom have tattoos on their faces. As we have noted, "[p]olice stations are not theatrical casting offices; a reasonable effort to harmonize the lineup is normally all that is required." Swicegood v. Alabama, 577 F.2d 1322, 1327 (5th Cir. 1978) (quoting United States v. Lewis, 547 F.2d 1030, 1035 (8th Cir. 1976)). Disparity in physical appearance among the lineup photos is not enough to render an identification suggestive. Id.

Lee's next argument is that the "show-up" identifications conducted after his arrest at the house at 3666 Metropolitan Street are impermissibly suggestive. Police brought Brandi Clavo and at least two others to the scene and asked them individually if they recognized Lee, who was being held in handcuffs.

---

[13] Indeed, Lee's argument that somehow the police render such an encounter "planned" and thereby commit a due process violation by deliberately publishing a photograph of a criminal suspect is hard to fathom.

Although we have not held "show-up" identifications of this type to be per se suggestive, there is certainly room for concern. The Supreme Court has noted that the "practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, has been widely condemned." Stovall v. Denno, 388 U.S. 293, 302 (1967). Even assuming arguendo, however, that the "show-up" identifications here were suggestive, Lee cannot show that there was a significant risk of misidentification under the five Biggers factors. Taking the most important witness as an example, Clavo had ample opportunity to view the person who exited the Maxima and fired repeatedly at her car from a very short distance away. She testified that her attention was trained on his face for several seconds before she ducked down. Although there is no record of what Clavo said about Lee's appearance before the "show-up," it is clear that she was both very certain of his identity and that it was a very short time indeed between her first encounter with Lee and the identification she made on Metropolitan Street. Thus we find no reason to believe that there was any significant risk of misidentification.

We therefore reject Lee's arguments that the district court abused its discretion by admitting the challenged identification evidence.

D.

Finally, Lee challenges the district court's denial of his motion for a mistrial based on the prosecutor's statements during

25

closing argument, alleging that these statements improperly appealed to the jury as the conscience of the community and also appealed to racial bias. We review this argument for an abuse of discretion and harmless error when a contemporary objection is made. United States v. Williams, 343 F.3d 423, 434 (5th Cir. 2003). Appeals to the jury to act as the conscience of the community are permissible, as long as they are not intended to inflame. United States v. Duffaut, 314 F.3d 203, 211 (5th Cir. 2002). In determining if a prosecutor's remarks constitute reversible error, we keep in mind three factors: "(1) the magnitude of the prejudicial effect of the prosecutor's remarks; (2) the efficacy of any cautionary instruction by the judge; and (3) the strength of the evidence supporting the conviction." United States v. Wyly, 193 F.3d 289, 299 (5th Cir. 1999).

The comments Lee cites fall far short of reversible error under this standard.[14] We discern no intention to inflame in the government's appeal to the jury to make the city safer, especially given that Lee's counsel had previously described New Orleans as a "high-crime city." Read in context, the prosecutor's mention of

---

[14] Regarding the prosecutor's appeal to the conscience of the community, Lee cites this statement: "New Orleans is a dangerous city. It is dangerous because of people like this. This is your chance to make the city a little bit safer."

An alleged appeal to racial bias cited by Lee was: "This guy, Jayson Lee, says, not 'just get in the trunk,' but 'get your white cracker ass in the trunk.' The same kind of racial remarks that you heard before."

the defendants' racially-tinged language was part of an attempt to show a common modus operandi among the perpetrators of the various carjackings and not as an appeal to bias. In short, we are confident that the district court did not err in refusing to grant a mistrial on this basis.

We therefore affirm Lee's convictions on all counts.

V.

For the foregoing reasons, the convictions of Lovelle Lang and Jayson Lee on all counts relevant to this appeal are

AFFIRMED.