# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

January 25, 2010

No. 08-60555

Charles R. Fulbruge III
Clerk

MIKE CHANEY, Commissioner of Insurance for the State of Mississippi, in His Official Capacity as Receiver of Franklin Protective Life Ins Company, Family Guaranty Life Ins Company and First National Life Ins Company of America; LESLIE A NEWMAN, Commissioner of Commerce and Insurance for the State of TN, in her official capacity as Receiver of Franklin American Life Ins Company; KIM HOLLAND, Insurance Commissioner for the State of Oklahoma, in her official capacity as Receiver of Farmers and Ranchers Life Insurance Company in Liquidation; JULIE BENAFIELD BOWMAN, Insurance Commissioner for the State of Arkansas, in her official capacity as Receiver of Old Southwest Life Insurance Company; LINDA BOHRER, Acting Director of the Department of Insurance, Financial Institutions and Professional Registration for the State of Missouri, in her official capacity as Receiver of International Financial Services Life Insurance Company

Plaintiffs - Appellants

v.

DREYFUS SERVICE CORP

Defendant - Appellee

Appeal from the United States District Court
for the Southern District of Mississippi

Before JOLLY, DeMOSS, and PRADO, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

No. 08-60555

I

Plaintiffs, receivers of seven insurance companies (the "Receivers"), appeal the grant of summary judgment in favor of Dreyfus Service Corporation ("DSC"). Throughout the 1990s the insurance companies' assets were looted through a complex fraud scheme perpetrated by the now infamous felon, Martin Frankel. In the underlying suit, the Receivers sought to impose tort and civil RICO liability on DSC, the investment company through which Frankel funneled the insurance companies' funds before moving them to his Swiss bank account. Had DSC properly discharged its duties, the plaintiffs argued, it would have uncovered Frankel's scheme and their losses would have been averted. They also alleged that by deliberately turning a blind eye to Frankel's obviously suspicious activities DSC effectively joined Frankel's conspiracy, thus becoming liable for treble damages under the civil recovery provisions of the Racketeer Influenced and Corrupt Organizations Act ("RICO").

The district court, after thoroughly reviewing New York and federal law, granted summary judgment in favor of DSC on each claim. As to the state tort claims, the court concluded that no duty ran to the insurance companies for eight of the accounts, and that the Receivers could not demonstrate causation for the remaining five. As to the federal RICO claim, the court concluded that a reasonable juror could not find that anyone at DSC was deliberately indifferent to Frankel's money laundering activities.

We agree with the district court except for one aspect: New York law does impose on DSC a duty—in this case running only to the named subaccounts—to ensure that the transactions it processes on behalf of its customers are authorized. We believe the Receivers have raised fact questions sufficient to survive summary judgment as to whether this duty was properly discharged by DSC's reliance on the insurance companies' actions and Frankel's representations, and whether a breach of this duty caused the insurance

2

companies' losses. The district court was correct, however, in concluding that the Receivers have not stated a viable theory of recovery in tort as to the remaining accounts held in the name of LNS. There is no evidence that DSC knew or ought to have known that the funds it processed on behalf of LNS were, in fact, fiduciary. The district court was also correct in finding the plaintiffs' RICO allegations are without merit, as there is no evidence that anyone at DSC knew or purposely contrived to avoid knowing that Frankel was engaged in money laundering.

We therefore affirm the judgment of the district court as to the tort claims against the LNS accounts and the RICO claims. We vacate the district court's judgment as to the tort claims against the named subaccounts and remand for further proceedings.

## II

From 1989 to 1991, Frankel fraudulently solicited $11 million for investment in a venture he called Creative Partners. He quickly dissipated $5 million of those funds for his personal use. In order replenish the funds so as to avoid detection, Frankel began searching for a bank to purchase and loot, engaging John Jordan, a Tennessee lawyer, and John Hackney, a Tennessee businessman. When that proved unsuccessful, the parties contrived a scheme to purchase and loot insurance companies. They recruited, among others, accountant Gary Atnip to assist in the plan.

Before acquiring his first insurance company, Frankel anonymously purchased a registered broker-dealer firm called Liberty National Securities, Inc. ("LNS"). Because the SEC had imposed a lifetime ban on Frankel for prior fraudulent activities, Frankel enlisted yet another co-conspirator to act as the figurehead of LNS and required him to keep the company registered and in good standing with the SEC and NASD. With LNS in place, Frankel moved to acquire his first insurance company, purchasing Franklin American Corporation

("FAC"), parent company of the Franklin American Life Insurance Company ("FAL"). Frankel then positioned his co-conspirators in key management positions. Hankney was made the president, chief executive officer, and chairman of the board of directors of both FAC and FAL; Atnip became both companies' chief financial officer; and Jordan served as both companies' counsel. Each understood the purpose of the purchase was to loot FAL; each was paid well for his continuing participation. With the companies' management in on the scheme, all Frankel had to do was have Hackney liquidate the company's existing portfolio, put LNS in charge of investing the company's liquid assets, and transfer the money to his personal account while LNS fabricated monthly statements reflecting holdings in U.S. Treasury bonds. Within a year, Frankel caused, through the series of transfers discussed below, nearly $25 million of FAL's assets to be liquidated and sent to a Swiss account under his control. All the while Frankel's cohorts led FAL's employees and customers and state insurance regulators to believe that FAL's assets were being invested in U.S. Treasury securities through LNS.

Frankel, however, did not stop there. In 1993, Frankel routed the proceeds from looting FAL back through FAC, causing FAC to purchase a second insurance company: Family Guaranty Life (FGL). Frankel's co-conspirators were again placed in key management positions, LNS began "managing" FGL's assets, and Frankel started liquidating and siphoning off assets into his Swiss account. This same pattern was repeated five more times. In 1994 and 1995, Frankel had FAC purchase Farmers and Ranchers Life Insurance Company (FRL), International Financial Services Life Insurance Company (IFS), and Protective Services Life Insurance Company, which was renamed Franklin Protective Life Insurance Company (FPL). In 1998, a Frankel-created holding company, International Financial Corporation (IFC), purchased First National

Life Insurance Company of America (FNL).  In 1999, FAL purchased Old Southwest Life Insurance Company (OSL).

Dreyfus Service Corporation (DSC), a registered broker-dealer and the provider of shareholder services for the Dreyfus family of mutual funds, became an instrument of the scheme—unknowingly—in 1994 as part of the process by which Frankel transferred funds from the insurance companies to his personal account in Switzerland.  Shortly after purchasing FGL, Frankel, using the alias Eric Stevens, opened two accounts with DSC.  The first, a retail money market account, was opened by Frankel on behalf of LNS, Inc.—an alias for Liberty National Securities, Inc.—upon completion of a written application.  This allowed Frankel to trade in various Dreyfus mutual funds with LNS, Inc. as the registered shareholder.  Frankel funded this initial account with $1.1 million from FGL's Tennessee bank accounts.  One day later, he redeemed all but $15 and had the proceeds wired to a New York bank and ultimately to his Swiss bank account.  This pattern of large purchases from the insurance companies' bank accounts and rapid redemptions to Frankel's personal accounts abroad would continue throughout Frankel's relationship with DSC.

A few months later, Frankel closed his retail account and opened his second account, a "master account," also in the name of LNS, Inc. but this time in DSC's institutional cash management fund.  Through this master account, Frankel was permitted to open subsidiary subaccounts in which shares were registered either in the name of LNS, Inc. or in a name other than that of the master account holder.  Between October 1994 and May 1999 Frankel opened twelve such subaccounts.  Five bore the name of LNS, Inc.  Two designated "International Financial Corporation" as the registered shareholder, using its taxpayer identification number and address.  The remaining five were opened using the initials, taxpayer identification numbers, and addresses of the

insurance companies.[1] Shares purchased in these subaccounts were registered in the name of the subaccount holder and were subject to wire redemption instructions that, although clearly moving the funds abroad, appeared to direct final credit back to the subaccount holder.[2] Frankel's trend of large purchases and rapid redemptions to offshore accounts via standing wire instructions, begun in his retail account, continued in these institutional management accounts. Over $480 million was wired from DSC accounts to Frankel's Swiss bank in this way. In order to continue the fraud over such a long period of time, Frankel would transfer money back to the insurance companies from the Swiss accounts as needed to meet their obligations. Discounting these circular transactions and funds otherwise recovered, Frankel stripped the seven insurance companies of nearly $200 million.

To say that DSC's efforts to identify the origin, legitimacy, or ultimate destination of the funds passing through its accounts were minimal is an understatement; such efforts were non-existent. As were DSC's attempts to get to know Frankel himself. The initial paper application required little information, none of which was investigated by DSC for accuracy and much of which could have been debunked through a cursory investigation.[3] All of Frankel's subsequent interactions with DSC, including account openings, purchases, and wire redemptions, were conducted over the phone. DSC made no effort to determine if the subaccounts were subsidiaries of LNS or if LNS was

---

[1] "FNL Company of America"; "FNL Company of America Receiving Account"; "FAL Company Receiving Account"; "FGL Company Receiving Account"; "OSL Co.".

[2] For example, for funds deposited in the FGL subaccount the registered shareholder was FGL and the wire redemption instructions were to some other bank "For Final Credit reference to FGL".

[3] For example, Frankel provided the name LNS, Inc. rather than Liberty National Securities, Inc.; the address Frankel provided for LNS, Inc. belonged to a Mail Boxes, Etc. store; Frankel represented to DSC that he was a real estate developer instead of the head of a securities broker-dealer.

a broker-dealer investing on behalf of other entities. At one point in 1997, one of DSC's institutional sales representatives attempted to meet with "Eric Stevens," but Frankel cancelled, citing the good standing of the business relationship. Although the structure and speed of his transactions were suggestive of money laundering under the regulations promulgated by the Office of the Comptroller of the Currency, DSC did not train its service personnel to recognize these red flags and so they went unnoticed. This conduct was consistent with DSC's position throughout these proceedings that its investment accounts are designed to provide maximum flexibility and liquidity with minimal interference, and that DSC owes few if any duties of care with respect to the processing of deposited funds.

In 1999, Frankel's house of cards finally collapsed. Insurance regulators realized they were supervising looted insurers and swept into action. Each company was placed in liquidation or receivership in its state of domicile with each state's insurance commissioner being named liquidator or receiver. The Receivers, as representatives of the insurance companies' estates, sued over 70 parties. Their individual claims were ultimately joined into the current action. In 2001 each plaintiff added DSC, alleging negligence and a RICO conspiracy claim. Nearly all other defendants have defaulted, settled, or entered bankruptcy. After years of discovery, DSC filed a motion for summary judgment and the Receivers filed two motions for partial summary judgment.

The thorough and conscientious district court reasoned that as to the bulk of the DSC accounts, DSC did not, under New York law, owe a duty to the insurance companies to protect against Frankel's looting of their assets. Furthermore, as to the accounts to which a duty might run—those subaccounts bearing the initials of the insurance companies—the Receivers failed to raise a genuine issue of material fact as to whether had DSC properly discharged its duty the Receivers' losses would have been averted. The court also rejected the

No. 08-60555

Receivers' RICO conspiracy charge, finding that no reasonable juror could conclude that anyone at DSC was aware of a high likelihood that money laundering was taking place. The district court thus granted summary judgment in favor of DSC on all claims made by each Receiver, further denying all other pending motions as moot. The Receivers timely appealed, arguing that the district court erred both in its application of New York and federal law and by improperly resolving questions of fact against the Receivers.

III

We review the district court's grant of summary judgment *de novo*, applying the same standard as the district court. *E.g.*, *Golden Bridge Tech., Inc. v. Motorola, Inc.*, 547 F.3d 266, 270 (5th Cir. 2008). Summary judgment is appropriate where the submissions show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. FED.R.CIV.P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "After consulting applicable law in order to ascertain the material factual issues, we consider the evidence bearing on the issues, viewing the facts and the inferences to be drawn therefrom in the light most favorable to the nonmovant." *Olabisiomotosho v. City of Houston*, 185 F.3d 521, 525 (5th Cir. 1999). In so doing, we make no credibility determinations or weigh any evidence and we disregard all evidence favorable to the moving party that the jury is not required to believe. *See Reaves Brokerage Co., Inc. v. Sunbelt Fruit & Vegetable Co., Inc.*, 336 F.3d 410, 412-413 (5th Cir. 2003). However, we are not required to accept the nonmovant's conclusory allegations, speculation, and unsubstantiated assertions which are either entirely unsupported, or supported by a mere scintilla of evidence. *See id.* at 413.

A

The Receivers primarily argue negligence—that DSC's failure to monitor for suspicious activity or verify redemption authority breached duties of care

that it owed to the insurance companies, causing their losses.  Having already determined in its disposition of an earlier motion that New York law applied, the district court decided the summary judgment motion on the basis of New York's tort law without objection from either party.  On appeal both parties have briefed New York law.  Even had either party preserved an objection to this choice of law, *see Kucel v. Walter E. Heller & Co.*, 813 F.2d 67, 74 (5th Cir. 1987), we believe it was proper to apply New York substantive law under Mississippi's "center of gravity" test.[4] *See Mitchell v. Craft*, 211 So. 2d 509, 515 (Miss. 1968); *see also Huss v. Gayden*, 571 F.3d 442, 450 (5th Cir. 2009).

To determine issues of state law, we look to the final decisions of that state's highest court.  *See, e.g.*, *Six Flags, Inc. v. Westchester Surplus Lines Ins. Co.*, 565 F.3d 948, 954 (5th Cir. 2009). "In the absence of such a decision, we must make an *Erie* guess and determine, in our best judgment, how that court would resolve the issue if presented with the same case." *Id.* (internal quotation marks removed). "In making an *Erie* guess, we defer to intermediate state appellate court decisions, unless convinced by other persuasive data that the highest court of the state would decide otherwise, and we may consult a variety of sources, including the general rule on the issue, decisions from other jurisdictions, and general policy concerns." *Travelers Cas. & Sur. Co. of Am. v. Ernst & Young LLP*, 542 F.3d 475, 483 (5th Cir. 2008) (internal citations and quotation marks removed). "Our task is to attempt to predict state law, not to create or modify it." *Herrmann Holdings Ltd. v. Lucent Techs., Inc.*, 302 F.3d 552, 558 (5th Cir. 2002) (internal quotation marks removed).

To establish a claim for negligence under New York law, the Receivers must prove: "(1) that [DSC] owed them a duty, or obligation, recognized by law,

---

[4] DSC's relationships with the insurance companies, out of which the claims against it arose, were centered at its headquarters in New York.  DSC's negligence, if any, occurred there.  Although all of the harm was felt outside New York, the harm was scattered, making it difficult to say that any one state has a tighter connection with this case than New York.

(2) a breach of the duty, (3) a reasonably close causal connection between [DSC's] conduct and the resulting injury and (4) loss or damage resulting from the breach." *McCarthy v. Olin Corp.*, 119 F.3d 148, 156 (2d Cir. 1997) (internal quotation marks omitted). Contrary to the Receivers' arguments, the existence of a duty is a question of law to be decided by the court. *See id.* (citing *Pulka v. Edelman*, 358 N.E.2d 1019, 1022 (N.Y. 1976)). Because New York imposes significantly different duties on financial organizations depending on whether the claimant is a customer or a third party, *compare Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 286 (2d Cir. 2006) ("As a general matter, '[b]anks do not owe non-customers a duty to protect them from the intentional torts of their customers.'") *with de Kwiatkowski v. Bear, Stearns & Co., Inc.*, 306 F.3d 1293, 1305 (2d Cir. 2002) ("No doubt, a duty of reasonable care applies to the broker's performance of its obligations to customers with nondiscretionary accounts."), we first consider whether the insurance companies were "customers" for the purpose of any of the accounts.

1

Of the thirteen accounts opened at DSC by Frankel, eight bore the name, address, and taxpayer identification number of LNS or IFC (the holding company created by Frankel for use in purchasing insurance companies) (collectively, the "LNS accounts"). The five remaining accounts—all subaccounts organized under LNS's master account—bore the name, address, and taxpayer identification number of one of the insurance companies. The district court found that the insurance companies were customers as to their named accounts but not as to the LNS accounts. On appeal, the Receivers accept these conclusions. DSC, on the other hand, agrees that the insurance companies were not customers as to the LNS accounts, but vigorously challenges the district court's conclusion that the insurance companies were customers of the named subaccounts. Because the parties are in agreement that the insurance

companies were not customers vis-à-vis the LNS accounts, we need not consider the issue. We need only consider whether the district court was correct in concluding that the insurance companies were customers as to the named subaccounts. We turn to that now.

The record establishes that the named subaccounts were opened via the phone by Frankel pursuant to LNS's master account agreement with DSC and the subaccounts were funded by deposits from the insurance companies' bank accounts. All account activity, prior and subsequent to funding, was directed by Frankel, including the provision of outgoing wire instructions. The insurance companies never communicated with DSC and, indeed, DSC argues that it was unaware that the names on the accounts referred to independent entities. On the strength of these facts, DSC argues that at all times LNS was its only customer.

But DSC's discussion of its relationship with the insurance companies is less than forthright. It is undisputed that the accounts were opened in abbreviated versions of the insurance companies' names using their real taxpayer identification numbers and addresses. It is also undisputed that the account holders were, in fact, separate and distinct legal entities and that DSC contacted them directly via monthly statements, albeit only by mail.[5] If nothing else, these last two points make this case unlike those cited by DSC, where the account title mirrored that of the defrauded corporation but the bank had no direct relationship with the corporation or any other reason to know of its

---

[5] These statements included a notice alerting the insurance companies that where the statement had a dealer code preceded by an asterisk, "your dealer broker or financial institution has placed trades on your behalf." The district court found that this indicated that DSC recognized the insurance companies as customers for the purpose of the subaccounts. We agree.

11

No. 08-60555

existence as an independent entity.[6]  *See Promissor, Inc. v. Branch Bank and Trust Co.*, 2008 WL 5549451 (N.D. Ga. 2008).

We recognize that DSC's relationship with the insurance companies was not that of a typical bank and its customers; in a very real sense they were strangers to DSC.  This fact complicates any attempt to impose on DSC duties the New York courts have utilized to protect banks' traditional customers with whom there is a clear relationship.  Certainly there are no cases explicitly including subaccount holders such as the insurance companies.   But neither have we been made aware of any case definitively excluding the insurance companies from New York's "customer" jurisprudence.  We thus consider as a matter of first impression whether New York courts would include such entities as customers.

Under New York law the imposition of a duty is a question of public policy.  The court determines the parties to whom the duty runs "by balancing factors, including the reasonable expectations of parties and society generally, the proliferation of claims, the likelihood of unlimited or insurer-like liability, disproportionate risk and reparation allocation, and public policies affecting the expansion or limitation of new channels of liability."  *In re New York City Asbestos Litig.*, 840 N.E.2d 115, 119 (N.Y. 2005).  Although not explicit, it is clearly the fear of imposing on banks endless, unpredictable liability that drives New York's distinction between a bank's customers and non-customers.  *See Century Bus. Credit Corp. v. N. Fork Bank*, 668 N.Y.S.2d 18, 19 (N.Y. App. Div. 1998) (stating that requiring a bank to monitor its customers' accounts for the benefit of its customers' creditors would "unreasonably expand banks' orbit of duty"); *Hamilton v. Beretta U.S.A. Corp.*, 750 N.E.2d 1055, 1061 (N.Y. 2001)

---

[6] DSC argues that the accounts could have just as easily referred to LNS's wholly owned subsidiaries rather than LNS's customers.  But even if the entities were wholly owned subsidiaries of LNS it would not have changed their status as independent legal entities for the purpose of transacting business with DSC.

12

No. 08-60555

(explaining that duties must be precisely defined to avoid imposing potentially "limitless liability"); *Eisenberg v. Wachovia Bank, N.A.*, 301 F.3d 220, 226 (4th Cir. 2002) (noting that to extend a bank's duties of care to non-customers would "expose banks to unlimited liability for unforeseeable frauds").

There is no such risk here. The funds in the accounts were registered to the insurance companies. The addresses and taxpayer identification numbers utilized in opening the accounts made it abundantly clear that the named entities were separate and distinct from LNS. Recognizing this fact, DSC sent the insurance companies monthly statements and confirmations of account activity. In short, the insurance companies in this case were well enough known to DSC that imposing the limited duties of care flowing to customers would hardly be crippling; nor would it "unreasonably expand" banks' "orbit of duty." *Century Bus. Credit Corp.*, 668 N.Y.S.2d at 19. We accordingly disagree with DSC that the only way an entity can qualify as a "customer," and thus access the protections afforded to that status under New York tort law, is if it opens the account itself or has some equivalently direct personal relationship with the financial institution. Because the insurance companies were customers as to their named subaccounts, they are entitled to the protections afforded to customers under New York tort law.

2

We have thus concluded that the insurance companies were customers of DSC for the purpose of the named subaccounts; as we have noted, it is conceded that the insurance companies were *not* customers of DSC with respect to the accounts in the name of LNS. We will now consider DSC's respective obligations to the insurance companies, first as non-customers, then as customers.

As a general matter, "[b]anks do not owe non-customers a duty to protect them from the intentional torts of their customers." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 286 (2d Cir. 2006) (internal quotation marks omitted); *see also*

13

No. 08-60555

*Renner v. Chase Manhattan Bank*, 1999 WL 47239, at 13 (S.D.N.Y. 1999) (finding it "well settled" that a bank owes no duty to non-customer third-parties to prevent its customers from defrauding them). This principle is true even as to fiduciary accounts. *See Home Sav. of Am., FSB v. Amoros*, 661 N.Y.S.2d 635, 637 (N.Y. App. Div. 1997) ("[A] depository bank has no duty to monitor fiduciary accounts . . . to safeguard the funds in those accounts from fiduciary misappropriation.").

Like most, this rule is not without exception. New York courts have recognized that a bank may be held liable for its customer's misappropriation where (1) there is a fiduciary relationship between the customer and the non-customer, (2) the bank knows or ought to know of the fiduciary relationship, and (3) the bank has "actual knowledge or notice that a diversion is to occur or is ongoing." *Id.* The Receivers urge us to apply this theory to their case.

Whether there was a fiduciary relationship is a question of fact. *See Penato v. George*, 383 N.Y.S.2d 900, 904-05 (N.Y. App. Div. 1976). Generally, a fiduciary relationship exists where "a party reposed confidence in another and reasonably relied on the other's superior expertise or knowledge." *Weiner v. Lazard Freres & Co.*, 672 N.Y.S.2d 8, 14 (N.Y. App. Div. 1998). Not every broker-customer relationship qualifies, but fiduciary duties can arise where the broker is empowered with discretion. *See Indep. Order of Foresters v. Donald, Lufkin & Jenrette, Inc.*, 157 F.3d 933, 940 (2d Cir. 1998); *Press v. Chem. Inv. Servs. Corp.*, 988 F. Supp. 375, 386-87 (S.D.N.Y. 1997). LNS's relationship with the insurance companies was, of course, discretionary. They deposited funds in the DSC accounts at the direction of LNS expecting LNS to use the funds to engage in bond trading on their behalf. Although a few individuals were aware of the fraud, most were not. There was more than enough evidence for a jury to find that a fiduciary relationship existed between the insurance companies and LNS—the broker-dealer with which they entrusted their funds.

14

No. 08-60555

The parties' briefs demonstrate substantial disagreement over the proper approach to prong two—whether the bank knows or ought to know of the fiduciary relationship. DSC argues that under New York law this prong can only be met by *actual* knowledge and that the Receivers' attempt to extend this duty to situations where a bank merely *ought to have known* of the relationship is improper. The Receivers, of course, disagree, as they have presented no evidence that any DSC employee had actual, subjective knowledge that the accounts were fiduciary.[7]

We are inclined to agree with the Receivers. DSC is correct in pointing out that in every case cited by the Receivers, the nature of the misappropriated funds was not in dispute. *See, e.g., Lerner*, 459 F.3d at 281 n.2. Only once has a New York court stated that a bank "knew or ought to have known" of the fiduciary nature of the funds it accepted, and that was in dictum. *See Fid. & Deposit Co. of Md. v. Queens County Trust Co.*, 123 N.E. 370, 372 (N.Y. 1919) ("The conclusion that the facts permit . . . [is] that the defendant knew or ought to have known that the funds deposited in the trustee account were trust funds . . . ."). However, neither has DSC pointed to a case expressly requiring subjective knowledge that the funds are fiduciary. Recognizing that it is an open question, we think the better rule—the one that would be chosen by New York's Court of Appeals—is that a plaintiff need only demonstrate that the bank *ought to have known* given the facts before it.

---

[7] The district court seems to have taken an even more restrictive view, finding that under New York law a bank's liability as a participant in fiduciary misappropriation is limited to accounts denominated as fiduciary. To the extent that the district court held that even actual knowledge that funds deposited were controlled by the account holder as a fiduciary is not enough to trigger a bank's obligations to the non-customer, it was incorrect. *See Lerner*, 459 F.3d at 281 n.2 ("[W]hether or not the accounts were titled as IOLA accounts, the banks had actual knowledge that they were intended to be trust accounts for client funds."); *Bischoff v. Yorkville Bank*, 112 N.E. 759, 760 (N.Y. 1916) (finding that the nature of the funds, rather than the status of the account, determines whether an individual holds the funds as a fiduciary). The title of the account is not dispositive.

No. 08-60555

By using the language "ought to have known" we mean that, like the third prong of New York's test for finding banks liable for fiduciary misappropriation, the defendant must be chargeable with the knowledge by having access to "[f]acts sufficient to cause a reasonably prudent person to suspect" that a fiduciary relationship underlies the funds and by failing to inquire as to the status of the funds. *Nw. Mortgage, Inc. v. Dime Sav. Bank of New York*, 280 A.D.2d 653, 654 (N.Y.A.D. 2001). Generally this will not be the case unless the facts support the "sole inference" that the funds being deposited are held in a fiduciary capacity. *See Lerner*, 459 F.3d at 287-88; *Bischoff v. Yorkville Bank*, 112 N.E. 759, 761 (N.Y. 1916). We stress that banks are generally not obligated, under New York law, to investigate whether funds deposited with them are fiduciary in nature. *See, e.g., Century Business Credit Corp. v. North Fork Bank*, 668 N.Y.S.2d at 19.

That being said, we agree with the district court that knowledge that a third party's funds are being deposited into an account is certainly not enough, alone, to show that the bank ought to have known that the funds were fiduciary. *See Renner v. Chase Manhattan Bank*, 1999 WL 47239 (S.D.N.Y. 2003); *Tzaras v. Evergreen International Spot Trading*, 2003 WL 470611 (S.D.N.Y. 2003). That leaves the Receivers in the uncomfortable position of arguing that DSC ought to have known that the funds were fiduciary from other information it actually knew.[8] That Frankel provided almost exclusively misinformation makes the Receivers' position even more difficult.

Undaunted, the Receivers argue that a jury could have found that DSC ought to have known that the funds deposited into the LNS accounts were fiduciary for the following reasons. First, all of the transfers into the LNS

---

[8] Because this is ultimately a fact question for the jury, the question on summary judgment is whether there is sufficient evidence for a jury to find for the Receivers on this point.

accounts came from bank accounts owned by the Insurance Companies or their affiliates, as plainly indicated by the transfer documents handled by DSC personnel. Second, the master accounts used by Frankel not only anticipated use by, but were indeed "targeted" toward, customers who would use the accounts in a "fiduciary" capacity. Third, Frankel opened five separate LNS subaccounts. Fourth, as soon as Frankel was informed that he could open accounts in the name of third parties he began to do so while at the same time continuing to push funds through the LNS accounts.

Notwithstanding these assertions, we are unconvinced that, with respect to the LNS accounts, the Receivers have raised a fact question that should be sent to the jury. It is undisputed that DSC's institutional accounts were marketed to fiduciaries and non-fiduciaries alike. It is similarly uncontested that the structure utilized by Frankel to invest in DSC's institutional funds—one master account with a number of subaccounts—is equally consistent with investment by an individual investor or a broker acting as an intermediary and thus handling funds as a fiduciary. That third-party funds are being invested under the primary account holder's name in a fund often used by fiduciaries is simply not enough, especially in the light of New York courts' decisions in *Renner* and *Tzaras*, for a reasonable jury to conclude that DSC ought to have known that LNS controlled the deposited funds as a fiduciary.

Before moving on, we should also refer to the Receivers' suggestion that the many "red flags" suggestive of money laundering gave rise to an obligation on behalf of DSC to investigate Frankel's account activity; and that in discharging this duty DSC would have discovered the fiduciary relationship between LNS and the insurance companies as well as Frankel's misappropriation. Some early cases articulating the duty of banks to prevent fiduciary misappropriation do use broad language regarding New York's duty of inquiry. *See Fid. & Dep. Co. of Md.*, 123 N.E. at 372-73 ("If a person has

knowledge of such facts as would lead a fair and prudent man, using ordinary thoughtfulness and care, to make further accessible inquiries, and he avoids the inquiry, he is chargeable with the knowledge which by ordinary diligence he would have acquired."). Later cases, however, make clear that any duty to investigate account activity can arise only if the institution knows or ought to know of the fiduciary nature of the funds of which it is in possession and there is a pattern of suspicious activity in the account. *See Lerner*, 459 F.3d at 287-88; *Northwest Mortgage, Inc.*, 280 A.D.2d at 654. The Receivers have cited no cases suggesting some broad duty for financial institutions to monitor all their accounts for suspicious activity and to investigate that activity upon discovery. We will certainly not act to impose such an expansive obligation.

This conclusion ends our inquiry into DSC's liability for funds deposited in the LNS accounts. Because DSC had no reason to know LNS controlled the funds as a fiduciary the insurance companies fall outside the scope of the duties owed by DSC with regard to fiduciary accounts. Because there is no independent obligation to investigate suspicious activity in non-fiduciary accounts, the nature and pace of Frankel's transactions could never have put DSC under a duty "to make reasonable inquiry and endeavor to prevent a diversion." *Lerner*, 459 F.3d at 288.

3

As to the insurance companies' subaccounts, however, the insurance companies were customers of DSC. Although its scope is not well developed, New York law does recognize that banks and brokers owe a duty of care to their customers. *See Dubai Islamic Bank v. Citibank, N.A.*, 126 F. Supp. 2d 659, 667-68 (S.D.N.Y. 2000) (collecting cases recognizing a duty of care to customers). The district court recognized that such a duty might exist, but decided this issue on the basis of a failure to demonstrate causation between DSC's alleged breach of its duties and the insurance companies' losses. Because it is impossible to decide

whether the Receivers' losses would have been averted had DSC fulfilled its obligations without precisely identifying those obligations, we start by identifying the duties owed by DSC to the insurance companies.

The insurance companies' accounts with DSC were nondiscretionary (i.e., all trades required authorization). Because "[a] nondiscretionary customer by definition keeps control over the account and has full responsibility for trading decisions," a financial institution's duties are limited. *de Kwiatkowski*, 306 F.3d at 1302 (finding that no general duty of care exists between a broker and the holder of a nondiscretionary account). "On a transaction-by-transaction basis, the broker owes duties of diligence and competence in executing *the client's* trade orders, and is obligated to give honest and complete information when recommending a purchase or sale." *Id.* (emphasis added). Complementary to this duty to exercise diligence in the execution of trade orders is at least *some* duty to ensure that an individual purporting to trade on the customer's behalf is actually authorized to do so. *See Dubai Islamic Bank*, 126 F. Supp. 2d at 667 (declining to dismiss, on a 12(b)(6) motion, claims that honoring unauthorized transfers out of a customer's account without attempting to verify authorization constituted negligence). This duty exists apart from any contractual obligations entered into by the parties, though it of course may also arise from or be satisfied by the parties' contractual arrangements. *See Indep. Order of Foresters*, 157 F.3d at 940-41 ("[W]here the terms of a nondiscretionary account require the customer's authorization on all transactions, a broker has a duty to obtain the client's authorization before making" trades).

Although this obligation would run to any transaction involving the subaccounts' funds, the circumstances of this case make it unnecessary to consider an institution's liability with respect to the management of assets within a nondiscretionary account by an unauthorized individual. To the extent

that DSC violated a duty that caused the Receivers' losses, it must arise out of the execution of Frankel's *redemption* orders to foreign banks.

Having decided that DSC owed the insurance companies a duty to determine if the redemptions from its accounts were actually authorized, we must ask whether there is a triable issue of fact as to whether DSC breached that duty. We conclude that there is. DSC took no steps to verify that LNS was authorized to make such extraordinary redemptions from the insurance companies' accounts;[9] it chose, instead, to rely exclusively on representations made by Frankel. Clearly, an agent's representations as to the scope of its authority are not determinative, and a third party proceeds on the basis of those representations at its own risk. *See Metro. Aluminum Mfg. Co. v. Lau*, 112 N.Y.S. 1059, 1061 (N.Y. App. Term 1908) ("[T]hird parties dealing with an avowed agent . . . do so at their own risk. They cannot rely upon the agent's assumption of authority, but are to be regarded as dealing with the power before them, and must at their peril observe that the act done by the agent is legally identical with the act authorized by the power."). DSC's insistence that Frankel's master contract authorized him to order the redemptions processed by DSC is similarly unavailing. Once the insurance companies are recognized as DSC's customers, a contract between DSC and LNS can hardly be used to satisfy tort duties owed from DSC to the insurance companies.

A jury reasonably could find that DSC's duty was discharged by its reliance on the insurance companies' repeated, voluntary transfer of funds into DSC accounts the insurance companies knew were established and controlled by Frankel.[10] *See Standard Funding Corp. v. Lewitt*, 678 N.E.2d 874, 877 (N.Y.

---

[9] This failure to make contact with the insurance companies is consistent with DSC's insistence that the insurance companies were not customers.

[10] Reliance on apparent authority is by no means the only method by which a financial institution could discharge its duties to its customers. But because DSC took no affirmative

1997) ("[A]pparent authority [is created by] *words or conduct of the principal* . . . that give rise to the appearance and belief that the agent possesses authority to enter into a transaction.") (emphasis in original, quotation marks omitted). Generally, a third party need not seek assurances of actual authority where it reasonably relies on the appearance of authority. *See C.E. Towers Co. v. Trinidad & Tobago (BWIA Intern.) Airways Corp.,* 903 F. Supp. 515, 523 (S.D.N.Y. 1995) ("Under New York law, an agent's authority may be actual or apparent."); *Marfia v. T.C. Ziraat Bankasi, N.Y. Branch*, 100 F.3d 243, 251 (2d Cir. 1996) (explaining that where there is apparent authority, "the principal is estopped to deny that the agent's act was not authorized"). This conduct continued despite the insurance companies' knowledge that the funds were being redeemed out of the accounts by LNS. That the redemption instructions on the account purported to direct final credit to the insurance companies makes DSC's reliance appear all the more reasonable.[11]

But a jury could also reasonably find that DSC's personnel, in the exercise of common judgment without any special training, should have recognized these transactions as suspicious and extraordinary, particularly with respect to the funds of an insurance company. The jury could go on to conclude that DSC's fiduciary duty to its customer, under the circumstances as a whole, required more than turning a blind eye to these extraordinary transactions in reliance on the unverified word of Frankel. *See Collision Plan Unlimited, Inc. v. Bankers Trust Co.*, 472 N.E.2d 28, 29 (N.Y. 1984) (finding that a duty to inquire into

steps to verify Frankel's authority to order redemptions from the accounts we do not consider whether, as a matter of law, those steps satisfied the tort duties owed by DSC to its customers, the insurance companies.

[11] This assumes, of course, that the insurance companies were aware of these wire instructions when depositing funds into the accounts, an issue on which the record appears to be silent. If they were not aware of the instructions, the existence of the instructions would be irrelevant to whether the insurance companies' actions created apparent authority.

No. 08-60555

actual authority may arise where a third party relies on apparent authority for "extraordinary" transactions).

Whether DSC's actions, in the light of what it knew or should have known, properly discharged its duty to process only authorized transactions, or whether in the context of all the circumstances to which we have referred, DSC breached its duty in not making some further inquiry, is a question best left for the jury. *See Di Benedetto v. Pan Am World Serv., Inc.*, 359 F.3d 627, 630 (2d Cir. 2004) ("[I]n New York, breach is determined by the jury . . . in [all] cases where there arises a real question as to a defendant's negligence . . . .") (internal quotation marks, brackets, and citation omitted).[12]

4

Assuming that DSC did fail in discharging its obligation to verify that the transactions were authorized, we turn to the basis upon which the lower court dismissed the subaccount claims—causation. The lower court held that there was insufficient evidence to support a jury finding that an inquiry of the insurance companies would have revealed the scheme and averted the losses. Almost certainly, according to the court, any inquiry would have gone to Hackney, Atnip, or Jordan, any of whom would have confirmed LNS's complete authority to act on the Insurance Companies' behalf with respect to the funds in the subaccounts. It dismissed the Receivers' arguments to the contrary as "speculation" insufficient to survive summary judgment. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1429 (5th Cir. 1996) (en banc) ("[C]onclusory allegations, speculation, and unsubstantiated assertions are inadequate to satisfy the nonmovant's burden."). For the following reasons, we find ourselves in disagreement.

---

[12] As is the existence of reasonable reliance itself. *Arol Dev. Corp. v. Whitman & Ransom*, 626 N.Y.S.2d 118, 120 (N.Y. App. Div. 1995) ("The issue of apparent authority presents what is inherently a fact determination.").

22

No. 08-60555

There is no doubt that Frankel's co-conspirators included substantial portions of the insurance companies' upper management. But because not everyone was in on the fraud, and because of extensive reporting requirements, Frankel's ability to operate without detection depended less on his "domination" of upper management and more on Frankel's ability to control and manipulate the flow of information. It is difficult to say precisely what would have occurred had DSC properly discharged its duty. Almost certainly DSC would have discovered that LNS stood for Liberty National Securities and Frankel would have been outed as a broker rather than a real estate agent. There is some evidence that this alone could have altered the relationship between DSC, Frankel, and the insurance companies by triggering an additional set of DSC procedures.

We recognize that DSC has presented counter-evidence that the insurance companies were receiving funds from a Swiss account, suggesting that officials likely to receive DSC's inquiry, whether in on the fraud or not, would not have considered foreign transactions to be beyond the scope of LNS's authority. DSC has also presented evidence suggesting that any inquiry would have been passed up the chain of command to Frankel's co-conspirators who would have authorized the transactions.

Although undoubtedly a close call, at the summary judgment stage, and on the record before us, we cannot assume that efforts by DSC to verify the relationship between "Eric Stevens" and the insurance companies would have been futile. At this stage in the proceedings it is enough to survive summary judgment that the Receivers identified individuals managing the insurance companies' investments who were not involved in the conspiracy and who the jury could reasonably believe would have known that redemptions to foreign

23

banks were inconsistent with the insurance companies' relationship with LNS.[13] In this case Judith Lowrey, the insurance companies' treasurer responsible for processing the companies' financial transactions, testified that, to her knowledge, wire redemptions were to the accounts of LNS, a domestic securities broker, for investment in U.S. treasury bonds, a domestic security. Her testimony was consistent with the documentation she received from DSC, as DSC's redemption confirmations provided only the date of the transactions and their amount, not the location to which the funds were being transferred or the name of the receiving account. A jury would not be unreasonable in believing that, upon finding that the funds were heading abroad, she would have cried foul.[14]

Put otherwise, we cannot hold, on the record before us today, that a jury would be unreasonable in concluding that inquiries from an outside source would have been directed, not to one of Frankel's few co-conspirators, but to one of the many other individuals unaware of the fraud. A jury might reasonably go on to conclude that it is more likely than not that such an individual would have alerted DSC that Frankel was a broker, not a real estate developer, that LNS was authorized only to invest insurance company funds in government securities, and that transferring the funds abroad exceeded this authority, thus stopping the diversion of funds to foreign banks. Within the bounds of reasonable disagreement it is up to the jury to decide the course of events had

---

[13] The statements sent to the insurance companies made clear that their funds were being wired somewhere, but the understanding of the insurance companies' employees was that the funds were being wired out to LNS for investment in government securities.

[14] At the very least she would have alerted DSC of LNS's status as a brokerage firm which, as we discussed above, may have been a significant signal leading to further inquiries.

24

No. 08-60555

DSC properly discharged its duties, including how much, if any, of the insurance companies' losses would have been averted.[15]

## B

The Receivers also seek to recover under a RICO conspiracy theory. 18 U.S.C. § 1962(d).[16] In order to demonstrate a RICO conspiracy under § 1962(d),

---

[15] Having concluded that the insurance companies have asserted a viable theory of recovery under New York tort principles, DSC urges us to hold that the claims are barred by New York Uniform Commercial Code § 8-115. In full, N.Y.U.C.C § 8-115 provides that:

A securities intermediary that has transferred a financial asset pursuant to an effective entitlement order, or a broker or other agent or bailee that has dealt with a financial asset at the direction of its customer or principal, is not liable to a person having an adverse claim to the financial asset, unless the securities intermediary, or broker or other agent or bailee:

(1) took the action after it had been served with an injunction, restraining order, or other legal process enjoining it from doing so, issued by a court of competent jurisdiction, and had a reasonable opportunity to act on the injunction, restraining order, or other legal process; or

(2) acted in collusion with the wrongdoer in violating the rights of the adverse claimant; or

(3) in the case of a security certificate that has been stolen, acted with notice of the adverse claim.

It is undisputed that DSC was acting as a "securities intermediary" and that none of the statute's three enumerated exceptions applies.

However, having found that the insurance companies were customers as to these accounts, it is clear that they are not "person[s] having an adverse claim" under this provision. *See Powers v. Am. Express Fin. Advisors, Inc.*, 82 F. Supp. 2d 448, 453 (D. Md. 2000) ("One cannot view Powers as an 'adverse claimant' under [Md. Commercial Law Code] Section 8-115, as she is simply one of two entitlement holders . . . ."); 8 Lawrence's *Anderson on the Uniform Commercial Code* § 8-102:4 [Rev.] at 654 (3d ed. 1994) ("[T]he claim of a customer against his or her broker[] is not an adverse claim."). This section would likely protect DSC as to LNS account activities (at least those taking place after this provision was implemented), but it cannot be thought to protect DSC against claims by its own customers that DSC failed to discharge its duty to ensure that transactions were authorized.

[16] This provision provides that:

(d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

25

the Receivers must demonstrate "(1) that two or more people agreed to commit a substantive RICO offense and (2) that [DSC] knew of and agreed to the overall objective of the RICO offense." *United States v. Sharpe*, 193 F.3d 852, 869 (5th Cir. 1999). A person cannot be held liable for a RICO conspiracy "merely by evidence that he associated with other . . . conspirators or by evidence that places the defendant in a climate of activity that reeks of something foul." *United States v. Posada-Rios*, 158 F.3d 832, 857 (5th Cir. 1998); *see Marlin v. Moody Nat. Bank, N.A.*, 248 F. App'x 534 (5th Cir. 2007). A conspirator must at least know of the conspiracy and "adopt the goal of furthering or facilitating the criminal endeavor." *Salinas v. United States*, 522 U.S. 52, 65 (1997). There is no doubt that Frankel and others committed a substantive RICO offense by using LNS to engage in, among other things, multiple predicate acts of money laundering. DSC's primary argument is that it was simply unaware that Frankel's transactions were designed to launder his ill-gotten gains and thus could not have "kn[own] of and agreed to the overall objective of the RICO offense."[17] *Sharpe*, 193 F.3d at 869.

---

Section (c), the section which Frankel was convicted of violating, provides that:

> (c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

[17] DSC also argues that the "overall objective" language from *Sharpe* requires the Receivers to prove that DSC agreed to assist Frankel in "defrauding the Insurance Companies while concealing [Frankel's] involvement and misappropriating their assets." However, we believe it would be enough that DSC "knowingly agree[d] to facilitate the [illegal] activities of those who [DSC knows] are operating an enterprise." *United States v. Useni*, 516 F.3d 634, 646 (7th Cir. 2008). DSC clearly knew that Frankel—to wit Eric Stevens—controlled and was acting through the entity LNS, thus DSC could be liable as a conspirator as long as it knowingly agreed to facilitate LNS's illegal conduct. The "overall objective" language from *Sharpe* was designed to *expand*, not restrict, the class of persons subject to conspiracy liability. A defendant need not know exactly what predicate acts the conspiracy intends to perpetrate so long as the defendant knows and agrees to facilitate the "overall objective" of the conspiracy.

No. 08-60555

Under the federal money laundering statute, 18 U.S.C. § 1956(a)(1)(B)(i), it is unlawful to conduct a financial transaction with knowledge that the proceeds involved are the product of unlawful activity and knowing that the transaction is designed to conceal or disguise the nature, location, source, ownership, or control of the proceeds. *See United States v. Giraldi*, 86 F.3d 1368, 1372 (5th Cir. 1996). Thus, as the district court explained, to survive summary judgment the Receivers must have presented sufficient evidence that DSC knew that the money funneled through their accounts was the product of unlawful activity, knew that at least one purpose[18] of the transactions it was processing on behalf of Frankel was to conceal the ownership of the funds, and agreed to assist Frankel in achieving this objective.[19]

The Receivers seem to grant that no one at DSC actually knew that money laundering was ongoing, arguing instead that the requisite knowledge can be established through the doctrine of deliberate ignorance. Deliberate ignorance exists where there is "a conscious effort to avoid positive knowledge of a fact which is an element of an offense charged . . . so [the defendant] can plead lack of positive knowledge in the event he should be caught." *United States v. Restrepo-Granda*, 575 F.2d 524, 528 (5th Cir.1978). It exists if (1) "the defendant was subjectively aware of a high probability of the existence of the illegal conduct" but (2) "purposely contrived to avoid learning of the illegal conduct." *United States v. Faulkner*, 17 F.3d 745, 766 (5th Cir. 1994). Neither awareness of *some* probability of illegal conduct nor a showing the defendant *should* have known is enough, and so "[t]he circumstances which will support [a] deliberate

---

[18] Not just an effect. *See Regalado Cuellar v. United States*, 128 S. Ct. 1994, 2005 (2008).

[19] Because agreement can be inferred from circumstantial evidence, including knowing participation, the only real issue is DSC's knowledge. *See, e.g., United States v. Brito*, 136 F.3d 397, 409 (5th Cir. 1998) ("[A] conspiracy can be inferred from a combination of close relationships or knowing presence and other supporting circumstantial evidence.").

27

indifference instruction are rare." *United States v. Lara-Velasquez*, 919 F.2d 946, 951 (5th Cir. 1990). It requires *conscious* action in light of *known* facts amounting to a "charade of ignorance." *Id.* In short, "deliberate ignorance is reflected in a . . . defendant's actions which suggest, in effect, 'Don't tell me, I don't want to know.'" *Id.* Deliberate ignorance is the legal equivalent of knowledge.

The record does not establish that any individual at DSC was subjectively aware of a high probability that Frankel was engaged in money laundering. Both parties agree that while Frankel's activity would have been suspicious to someone trained to recognize the "red flags" associated with money laundering, DSC's client specialists were not so trained.[20] Beyond the transactions themselves there was precious little information provided from Frankel to the client specialists. The few odd statements made by Frankel to client specialists—for example, that he had to engage in complex multi-bank transactions in order to "show" money for a real estate deal—were certainly not enough to make anyone aware of a high probability that he was engaged in money laundering. Moreover, there is no evidence that Frankel had repeated dealings with the same specialist.

The Receivers seek to avoid this conclusion by aggregating DSC's client specialists' experience with that of DSC's compliance officers through a "collective knowledge" theory. This argument was never raised to the district court and we need not consider it now. *See Forbush v. J.C.Penney Co.*, 98 F.3d 817, 822 (5th Cir.1996) ("[T]he Court will not allow a party to raise an issue for the first time on appeal merely because a party believes that he might prevail if given the opportunity to try a case again on a different theory.").

---

[20] To the extent that this was a strategy by DSC management to avoid guilty knowledge, its effect on the Receivers' RICO claim is considered next; to the extent that this was merely negligent, the Receivers' remedy would be in tort, not RICO.

No. 08-60555

Even if we were to consider it, we note that, as a general rule, where "an essentially subjective state of mind is an element of a cause of action" we have declined to allow this element to be met by a corporation's collective knowledge, instead requiring that the state of mind "actually exist" in at least one individual and not be imputed on the basis of general principles of agency. *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 366 (5th Cir. 2004); *see also United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1122 (D.C. Cir. 2009) (distinguishing "collective knowledge" from "collective intent" and questioning the latter's "legal soundness"); Restatement (2nd) Agency § 275, comment b. The first prong of our deliberate ignorance doctrine clearly falls within this category.[21] *See Lara-Velasquez*, 919 F.2d at 951-52 ("The term deliberate ignorance denotes a *conscious* effort to avoid positive knowledge. . . . [It thus] protects a defendant from being [held liable] for what he *should* have known.") (first emphasis added). Of course, even if the first prong of our test could be met by corporate knowledge, we would still have to find that someone at DSC purposely contrived to avoid confirming information that was suspected exclusively on a corporate level. *See id.* at 952 ("[A] defendant could not purposely avoid learning of illegal conduct unless *he* were subjectively aware that a high probability of illegal conduct exists.") (emphasis added).

The Receivers' more supportable argument is that DSC's management knew that structuring DSC's policies in the way they did—requiring minimal information for account openings; taking no steps to verify this information; segregating transactional and compliance personnel; randomly assigning client

---

[21] The Receivers argue that such a rule, i.e., that knowledge will not be aggregated across individuals in a corporation to meet the subjective awareness prong of our deliberate ignorance test, would allow corporations to avoid liability by compartmentalizing information. To the extent that this is purposeful, we consider it in the next section; to the extent that it is an incidental effect of the corporate structure, we are not concerned, as the basis for RICO conspiracy liability is the *intentional* facilitation of a RICO enterprise, not the incidental facilitation thereof.

29

specialists; systematically refusing to train client specialists to identify suspicious account behavior; all as part of a larger effort to compete on the basis of liquidity—created a high probability that its funds would be used for money laundering.  Refusing to implement policies capable of identifying money laundering under these circumstances constituted "purposeful contrivance"—in other words, DSC's management knew its customers would take advantage of its structure to engage in money laundering, knew what steps would likely detect it, but declined to take these steps.

Though not directly on point, cases cited by the Receivers seem to provide some support for such a theory.  *See Ga. Elec. Co. v. Marshall*, 595 F.2d 309, 319 (5th Cir. 1979) (finding that violation of an OSHA regulation is "willful" when a corporation acts with complete indifference to its occurrence by failing to educate its employees).  Certainly, failing to ask questions in the face of highly suspicious activity may be enough, in some situations, to satisfy the purposeful contrivance prong of the test. *United States v. Nguyen*, 493 F.3d 613, 622 (5th Cir. 2007) ("Not asking questions can be considered a purposeful contrivance to avoid guilty knowledge.").  Nevertheless, in this case, the record indicates that DSC's actions at worst rose to the level of recklessness.  DSC's policies do not amount to a special invitation targeting people like Frankel, such that would support a jury finding that DSC's managers were subjectively aware of a high probability that its funds would be used for illegal purposes.

Because the Receivers have presented no theory by which DSC could be properly charged with knowledge of Frankel's money laundering, summary judgment was appropriate on the Receivers' RICO conspiracy claim.

IV

We conclude.  As to the LNS accounts and subaccounts the Receivers have failed to present evidence that DSC knew or should have known of the fiduciary relationship between LNS and the insurance companies.  New York law thus

No. 08-60555

imposed no duty of care on DSC as to the funds passing through those accounts. The district court's judgment in this respect is affirmed. The Receivers have, however, demonstrated that they were DSC's customers as to five of the subaccounts and, consequently, we have considered DSC's liability in that context. New York law imposes a limited duty on DSC to ensure that the transactions it processed on their behalf, as its customers, were indeed authorized. The Receivers have raised a fact question as to whether, given the nature of the transactions at issue, this duty was properly discharged by DSC's reliance on Frankel's representations and the insurance companies' deposits into these accounts. We further conclude that, on the record before us, a jury could find that an inquiry into Frankel's authorization to redeem funds to foreign bank accounts would have prevented some of the insurance companies' losses. Thus, the district court's judgment in this respect is vacated, and the case is remanded for further proceedings on this claim relating to the customer accounts.

As to the RICO claims, we find the Receivers' arguments to be without merit. RICO conspiracy liability is based on the *knowing* participation in and facilitation of activities in violation of RICO.[22] No one at DSC was actually aware that Frankel was engaged in money laundering; nor was anyone subjectively aware of a high probability that Frankel was engaged in money laundering. Without actual knowledge of Frankel's illegal activities or a demonstration of deliberate ignorance, the Receivers' RICO claim must fail. Accordingly, the district court's judgment on the RICO claim is affirmed.

For these reasons, the judgment of the district court dismissing the complaint is AFFIRMED in part and VACATED in part, and the case is REMANDED for further proceedings not inconsistent with this opinion.

---

[22] As explained above, unlike negligence claims, RICO liability cannot be made out by recourse to what DSC should have known or to that which it would have discovered had DSC properly discharged any tort-based duties of care or inquiry.

31

No. 08-60555

AFFIRMED in part; VACATED in part; and REMANDED.